STATE OF NORTH CAROLINA v. SHARON ANNETTE HATFIELD ANDERSON

No. 8625SC792

(Filed 7 April 1987)

**Criminal Law § 50.1; Obscenity § 3— disseminating obscenity—community tolerance—expert opinion testimony admissible**

    In a prosecution of defendant for disseminating obscenity the trial court erred in excluding opinion testimony by a sociologist that the average adult

State v. Anderson

person in the community would tolerate the magazines defendant allegedly sold and that the material was not patently offensive to the average person in the community, since the witness performed an ethnological study to arrive at his opinion; the study was described in great detail; as a result of the study the expert acquired specialized knowledge of contemporary community standards with respect to what he defined as "adult materials"; and the probative value of his opinion testimony outweighed any potential for prejudice, confusion or undue delay.

APPEAL by defendant from *Lewis (Robert D.), Judge.* Judgments entered 28 March 1986 in Superior Court, CATAWBA County. Heard in the Court of Appeals 12 January 1987.

Defendant was charged in proper bills of indictment with four (4) counts of disseminating obscenity in violation of G.S. 14-190.1(a)(1).

On 7 October 1985 Investigator Mulher of the Hickory Police Department entered the Imperial Newsstand and purchased two magazines entitled *Jets of Jizz* and *Ass Masters, Special #3* from the defendant. On 8 October 1985 he again entered the Imperial Newsstand and purchased two magazines entitled *Super Sex Stars #1* and *Ass Masters, Special #4* from the defendant. On 9 October 1985 the defendant was arrested and charged with four counts of disseminating obscenity in the sale of the magazines.

The jury returned a verdict acquitting defendant of disseminating obscenity in the sale of the magazines entitled *Jets of Jizz* and *Super Sex Stars #1.* The jury convicted defendant of disseminating obscenity in the sale of the magazines entitled *Ass Masters, Special #3* and *Special #4.*

The trial court entered judgments sentencing defendant to three years imprisonment on each count. Execution of the sentences was suspended and defendant was placed on supervised probation for five years. As a special condition of probation defendant was ordered to serve an active prison term of six months in the custody of the Department of Corrections as a committed youthful offender. As a regular condition of probation, defendant was fined $5,000.00 for each count. Defendant appeals.

*Attorney General Thornburg by Assistant Attorney General Thomas J. Ziko for the State.*

*Lipsitz, Green, Fahringer, Roll, Schuller & James by Paul J. Cambria, Jr., Herbert L. Greenman and Cherie L. Peterson and James, McElroy & Diehl by Edward T. Hinson, Jr. for defendant-appellant.*

EAGLES, Judge.

At trial defendant presented two expert witnesses, Dr. Charles Winick and Dr. Joseph Scott, to assist the jury in determining "contemporary community standards" relating to publications containing the depiction or description of sexual matters. The trial court excluded from evidence the results of a public opinion poll conducted by Dr. Winick on the issue of community standards. The trial court also refused to allow Dr. Scott to give his opinion about "whether or not [the] four magazines exceeded the community level of tolerance" and whether the magazines "depicted or described sex in a patently offensive way, a way not tolerated by the average adult in the community." Defendant contends that these rulings constitute an abuse of discretion and reversible error. We conclude that the trial court's treatment of Dr. Winick's testimony was appropriate; however, we agree with defendant that the exclusion of Dr. Scott's expert testimony was reversible error and requires a new trial.

In *Miller v. California*, 413 U.S. 15, 37 L.Ed. 2d 419, 93 S.Ct. 2607 (1973) the Supreme Court held that obscenity is to be determined by applying "contemporary community standards." *Id.* at 37, 37 L.Ed. 2d at 438, 93 S.Ct. at 2622. As explained by the court, the basic guidelines for the trier of fact must be:

> (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, [citations omitted]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24, 37 L.Ed. 2d at 431, 93 S.Ct. at 2615. Precisely what appeals to the "prurient interest" and what is "patently offensive"

are questions of fact. *Id.* at 30, 37 L.Ed. 2d at 434, 93 S.Ct. at 2618.

The definition of obscenity in G.S. 14-190.1 codifies the *Miller* three-part test. G.S. 14-190.1(b) requires three factual findings before material can be defined as obscene. First, the jury must find that the material depicts "sexual conduct" in a patently offensive way. This requires a two-part inquiry: (1) does the material in question contain descriptions or depictions of sexual conduct defined in G.S. 14-190.1(c), and if so, then (2) is the sexual conduct depicted or described in a "patently offensive way?" Second, the jury must find that the average person applying contemporary community standards relating to the depiction or description of sexual matters would find that the material taken as a whole appeals to the prurient interest in sex. Third, the jury must find that the material lacks serious literary, artistic, political or scientific value. G.S. 14-190.1(b)(1)-(3).

While G.S. 14-190.1(b) includes "contemporary community standards" only with reference to the "prurient interest" part of the statutory definition of obscenity, the Supreme Court has made it clear that under the *Miller* test "contemporary community standards" provide the measure against which juries decide both the questions of appeal to the prurient interest *and* patent offensiveness. *Smith v. United States*, 431 U.S. 291, 52 L.Ed. 2d 324, 97 S.Ct. 1756 (1977). The principal concern in requiring judgment to be made on the basis of contemporary community standards is to assure that the challenged material is not judged on the basis of each juror's own personal opinion or judged by its effect on a particularly sensitive or insensitive individual or group. *Hamling v. United States*, 418 U.S. 87, 41 L.Ed. 2d 590, 94 S.Ct. 2887 (1974). As explained by the Court in *Miller* "the primary concern with requiring a jury to apply the standard of 'the average person applying contemporary community standards' is to be certain that . . . [the material] will be judged by its impact on an average person." 413 U.S. at 33, 37 L.Ed. 2d at 436, 93 S.Ct. at 2620.

The Supreme Court has held that there is no constitutional need for expert testimony that the materials are obscene once the materials have been placed in evidence. *Paris Adult Theatre I v. Staton*, 413 U.S. 49, 37 L.Ed. 2d 446, 93 S.Ct. 2628 (1973). The

materials themselves are the best evidence of what they represent. *Id.* The subject of obscenity does not lend itself to the traditional use of expert testimony because expert testimony is usually admitted to explain to juries what they otherwise would not understand. *Id.* "No such assistance is needed by jurors in obscenity cases." *Id.* at 56, 37 L.Ed. 2d at 456, 93 S.Ct. at 2634. However, in *Kaplan v. California*, 413 U.S. 115, 37 L.Ed. 2d 492, 93 S.Ct. 2680 (1973) the court, citing Justice Frankfurter's concurring opinion in *Smith v. California*, 361 U.S. 147, 160, 4 L.Ed. 2d 205, 215, 80 S.Ct. 215, 222 (1959), pointed out that the *defense* is free to introduce appropriate expert testimony in obscenity litigation. 413 U.S. at 121, 37 L.Ed. 2d at 498, 93 S.Ct. at 2685. As explained by Justice Frankfurter:

> [It is] the right of one charged with obscenity — a right implicit in the very nature of the legal concept of obscenity — to enlighten the judgment of the tribunal, be it the jury or . . . the judge, regarding the prevailing literary and moral community standards and to do so through qualified experts.
>
> There is no external measuring rod for obscenity. Neither, on the other hand, is its ascertainment a merely subjective reflection of the taste or moral outlook of individual jurors or individual judges. Since the law through its functionaries is "applying contemporary community standards" in determining what constitutes obscenity, . . . it surely must be deemed rational, and therefore relevant to the issue of obscenity, to allow light to be shed on what those "contemporary community standards" are. Their interpretation ought not to depend solely on the necessarily limited, hit-or-miss, subjective view of what they are believed to be by the individual juror or judge.

361 U.S. at 164-65, 4 L.Ed. 2d at 218, 80 S.Ct. at 225 (Frankfurter, J., concurring).

While it is established that expert testimony is admissible in obscenity trials, the trial court retains "wide discretion in its determination to admit and exclude evidence, and this is particularly true in the case of expert testimony." *Hamling v. United States, supra* at 108, 41 L.Ed. 2d at 615, 94 S.Ct. at 2903. Once the expert witness demonstrates "knowledge, skill, experience, training or education" as required by Rule 702 of the Rules of Evi-

dence, the test of admissibility is "helpfulness." H. Brandis, *North Carolina Evidence* Section 132 (Cum. Supp. 1986). As explained by this court in *State v. Knox*, 78 N.C. App. 493, 337 S.E. 2d 154 (1985), "[t]he test for admissibility is whether the jury can receive 'appreciable help' from the expert witness." *Id.* at 495, 337 S.E. 2d at 156. "Applying this test requires balancing the probative value of the testimony against its potential for prejudice, confusion, or undue delay." *Id.*

Prior to trial, defendant employed Dr. Joseph Scott to conduct an ethnological study to determine "the level of tolerance for adult material" in Catawba County. Dr. Scott, a sociologist with a background in statistical methodology, testified that ethnology looks at "what is going on in the community" and specifically "in this area with regard to adult material, what is available, what are the behavior patterns, how do they reflect the tolerance in the community or the level of the tolerance of the adult material in the community by the adults in the community." Dr. Scott testified that this type of study is an accepted procedure of sociology to measure the community's level of tolerance for adult material.

In performing his ethnological study, Dr. Scott visited 38 locations in Catawba County where adult magazines were sold. Dr. Scott defined "adult magazines" as ranging from the "extremely mild to naked shots of women [sic] breasts and vulva area and penis and so forth up where you have pictures of couples together where they are engaging in oral, anal and vaginal sex." He viewed the adult magazines displayed at these locations and talked with store clerks to obtain opinions about these magazines as expressed by purchasing and nonpurchasing patrons. After visiting these 38 locations Dr. Scott then met with the general manager of the major distributor of magazines in the area to determine the total number of magazine outlets in the county and the percentage of the magazine outlets that sell adult material. He conducted a comparative study to determine adult magazine circulation in Catawba County as compared to North Carolina and the United States as a whole. Dr. Scott visited 12 video tape rental (and sales) outlets to determine the availability of and demand for adult video tapes, the type of people who rent them and the percentage of video rentals comprised of adult movies. There too he interviewed outlet staff personnel. Dr. Scott also visited three adult bookstores in Catawba County and talked with customers

and clerks there. He visited the local cable television company to determine the number of subscribers to the adult movie channel. He visited local bars which featured topless dancers. He spoke with the local newspaper editor and the person in charge of the newspaper's editorial section. He read every letter to the editor for local newspapers on the subject from 1 January 1985 through October 1985. He testified that his objective was to determine "what was going on" in the community.

Dr. Scott testified that he received a copy of each of the four magazines that defendant sold to Officer Mulher. He explained that based on his ethnological study and his examination of the four magazines, he formed an opinion as to whether or not the sexual conduct depicted in the four magazines "exceeded the community level of tolerance" for sexual conduct in Catawba County. However, following an objection by the State, Dr. Scott was not permitted to state his opinion. On *voir dire* Dr. Scott was questioned by defense counsel and the court as follows:

Q. [defense counsel] Now as a result of this [study], were you able to render and are you able to render an opinion whether or not the material in this case, these four magazines, depict and describe sexually patently offensive conduct specifically defined by the law of North Carolina?

A. Yes.

COURT: To the average person in the community.

Q. To the average adult person in the community.

A. Yes.

Q. What is your opinion?

A. My opinion is that it is tolerated by the average adult person in the community.

COURT: That is not the question, sir. The question is whether it is patently offensive to the average adult person in the community.

A. My answer would be that it is not patently offensive to the average person in the community.

The trial court sustained the State's objection to Dr. Scott's testimony that in his opinion the average person in Catawba County

would not find the four subject magazines to be patently offensive. Defendant contends that it was error to exclude this opinion testimony. We agree.

We emphasize what the Supreme Court has already made clear, i.e., "contemporary community standards take on meaning only when they are considered with reference to the underlying questions of fact that must be resolved in an obscenity case." *Smith v. United States, supra,* 431 U.S. at 300, 52 L.Ed. 2d at 334, 97 S.Ct. at 1763. The underlying questions of fact are whether the material appeals to a prurient interest in sex and is patently offensive. *Id.* at 300-01, 52 L.Ed. 2d at 334-35, 97 S.Ct. at 1763-64. Accordingly, in order for a study like Dr. Scott's ethnological study to be relevant, i.e. appreciably helpful to the jury, the study must be related to the underlying factual questions that the jury is being asked to decide.

The transcript of Dr. Scott's testimony indicates that in Dr. Scott's expert opinion contemporary community standards are revealed by what type of activity adults in the community will "tolerate." As Dr. Scott explained, he came to Catawba County at defendant's request to "look at the community and determine what the tolerance level was in this community for adult material." He also explained that he used the ethnological study method in order to determine how community behavior patterns reflect "the level of the tolerance of the adult material in the community." The trial court expressed concern about this use of the word, "tolerance." It appears, from the trial transcript, that defendant's reliance on this standard of what the community will "tolerate" comes from the following language in *Smith v. United States, supra:*

> Our decision that contemporary community standards must be applied by juries in accordance with their own understanding of the tolerance of the average person in their community does not mean, as has been suggested, that obscenity convictions will be virtually unreviewable. We have stressed before that juries must be instructed properly, so that they consider the entire community and not simply their own subjective reactions, or the reactions of a sensitive or of a callous minority. See *Miller v. California,* 413 U.S. at 30.

431 U.S. at 305, 52 L.Ed. 2d at 338, 97 S.Ct. at 1766. However, the Court in *Smith* was trying to explain its position in *Miller v. California, supra,* that the primary logic behind requiring juries to apply "contemporary community standards" is to insure that the material under scrutiny is judged by its *impact* on an average person rather than a particularly sensitive or insensitive one. 413 U.S. at 33, 37 L.Ed. at 436, 93 S.Ct. at 2620. Reading *Miller* and the above-quoted portion of *Smith* together, the concern is with the material's impact as measured by its effect on the average person in the community. "Tolerance" in this sense means the ability of the average person in the community to endure the impact or effect of this type of material and not whether the average person in the community "tolerates" widespread availability and the permissive attitudes of others.

Though the State contends otherwise, it is not clear that Dr. Scott's study is entirely based on the impermissible definition of "tolerance." The best way for Dr. Scott to determine the impact of these four magazines on the average person in the community is to go throughout the community showing these magazines to various randomly selected adult community residents. However, as defendants point out and the State agrees, if the magazines are in fact obscene, Dr. Scott is not permitted by law to disseminate them by showing them to randomly selected residents. What he did then was one of the next best things. While some of his methods could be said to demonstrate mere availability, accessibility and generally permissive attitudes, we do not believe that the study is so entirely flawed as to render his opinion on patent offensiveness wholly irrelevant and inadmissible. G.S. 8C-1, Rule 702 of our Rules of Evidence provides that if "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." The test for admissibility is whether the jury can receive appreciable help from the expert witness. *State v. Knox, supra.* We are required to balance the probative value of the testimony against its potential for prejudice, confusion or undue delay.

It is clear from the record that as a result of his study Dr. Scott acquired specialized knowledge of contemporary community standards with respect to what he defined as "adult materials."

State v. Anderson

However, the Supreme Court has said that contemporary community standards take on meaning only when they are applied to the factual questions before the jury, i.e. appeal to prurient interest and patent offensiveness. Therefore, if Dr. Scott, based on his specialized knowledge of contemporary community standards, formed an opinion about whether the challenged materials would be patently offensive to the average person in the community, then we can see no reason, based on a relevancy objection, to prevent the jury from having the benefit of that opinion testimony. Without Dr. Scott's opinion testimony the only evidence defendant was allowed to present to the jury on contemporary community standards were Dr. Winick's two survey questions which informed the jury only that 76% of the people interviewed believed that in recent years standards have changed and the depiction of nudity and sex is more acceptable in movies, video cassettes, publications and other material available to adults but not children.

We believe that the probative value of Dr. Scott's opinion testimony outweighs any potential for prejudice, confusion or undue delay. In reaching this decision, we have been attentive to the Supreme Court's observation in *Kaplan v. California* that the defense is free to introduce appropriate expert testimony on the obscenity question, 413 U.S. at 121, 37 L.Ed. 2d at 498, 93 S.Ct. at 2685. We are similarly advertent to the language in Justice Frankfurter's concurring opinion in *Smith v. California* that "it surely must be deemed rational, and therefore relevant to the issue of obscenity, to allow light to be shed on what those 'contemporary community standards' are." 361 U.S. at 165, 4 L.Ed. 2d at 218, 80 S.Ct. at 225. Here, the trial court erred in sustaining the State's objection to Dr. Scott's opinion testimony as to the patent offensiveness of these magazines. We cannot say that the effect was not prejudicial here since this was defendant's only relevant evidence of contemporary community standards. Defendant is therefore entitled to a new trial.

New trial.

Judges WELLS and GREENE concur.