UNITED STATES of America

v.

Dennis E. PRYBA, Barbara A. Pryba,
Jennifer G. Williams, and
Educational Books, Inc.

Crim. No. CR 87–00208–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 29, 1988.

As Revised Feb. 12, 1988.

Lawrence Leiser, Asst. U.S. Atty., Alexandria, Va., for U.S.

Thomas J. Morris, Arlington, Va., for Dennis E. Pryba.

William B. Cummings, Alexandria, Va., for Barbara A. Pryba.

Plato Cacheris, Washington, D.C., for Jennifer G. Williams.

J. Frederick Sinclair, Alexandria, Va., for Educational Books, Inc.

## MEMORANDUM OPINION

ELLIS, District Judge.

Defendants in this novel RICO–obscenity case [1] sought in the course of trial to introduce certain poll and survey results and "expert" testimony on the issue of obscenity. The Court permitted *voir dire* of the proferred experts, examined the challenged material as well as allegedly comparable material, and reviewed the poll and survey results and methodology before ruling that the evidence must be excluded. This Memorandum Opinion records the reasons for these rulings.[2]

### Background

A twelve count indictment charged three individuals and one corporation with *inter alia,* racketeering in connection with the interstate sale of obscene videos and magazines and tax fraud. Central to the RICO and obscenity counts was whether the charged materials were legally obscene. The constitutional test for obscenity was announced by the Supreme Court in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Material is obscene and loses First Amendment protection where the factfinder concludes that:

(1) the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;

(2) the work describes, in a patently offensive way, sexual conduct specifically defined; and

(3) the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24, 93 S.Ct. at 2614–15; *see also Pope v. Illinois,* —— U.S. ——, 107 S.Ct. 1918, 1920, 95 L.Ed.2d 439 (1987); *Roth v. United States,* 354 U.S. 476, 487, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957).

The question for the jury then was whether the charged materials met these tests. The question for the Court was whether, given the Miller test, the survey and expert testimony were admissible. Imbedded in this question, as the discussion following shows, were issues of relevancy, probative value, jury confusion, unfair prejudice, and competency. To understand why the Court resolved these issues

---

1. For other opinions concerning issues in this case, see *United States v. Pryba,* 674 F.Supp. 1504 (E.D.Va.1987) (various issues including constitutionality of RICO in obscenity context); *United States v. Pryba,* 674 F.Supp. 1502 (E.D.Va.1987) (ruling on motion to disqualify counsel); *United States v. Pryba,* 674 F.Supp. 1518 (E.D.Va.1987) (forfeiture issues); *United States v. Pryba,* 678 F.Supp. 1218 (E.D.Va.1988) (motion for acquittal ruling).

2. The Court delayed issuance of this memorandum opinion to await the transcript. Since it is not yet available, the Court has concluded that further delay is unwarranted.

against admissibility, it is necessary to describe in some detail the nature of the charged materials.[3]

### The Charged Materials

The charged materials consist of four videotapes and nine magazines. Each is separately described.

1. *She–Male Confidential, Bizarre Encounter # 9.* This video depicts a variety of sexual activities involving "she-males"—persons who have female bodies, including fully developed breasts. They are women in all respects save one: they have male genitalia. In the first scene, two she-males dressed as women engage in fellatio and anal intercourse with a man. The second vignette depicts a she-male inserting what appears to be a large pipe into a woman's anus. The she-male and the woman also engage in vaginal and anal intercourse. The third scene, captioned "Spanked by a Stranger," shows a man throwing a she-male to the ground and performing fellatio upon the she-male. The man then has anal intercourse with the she-male.

2. *Wet Shots.* This video features men and women engaged in vaginal and anal intercourse and oral sex. Many of the scenes involve groups of men and women. The film also contains close-up depictions of male ejaculations on the bodies and faces of others. In one scene, men are shown ejaculating into a glass of liqueur. A woman then drinks the mixture.

3. *The Girls of the A–Team.* This film, as the title might suggest, is devoted chiefly to showing anal intercourse between men and women, in couples and in groups. The film also depicts a variety of other sexual activities between women in couples and larger groups, including vaginal and anal insertion of a range of objects.

4. *The Punishment of Anne.* This video predictably has a sado-masochistic theme. A woman and a man subject a younger woman to various forms of degradation, including forcing her to urinate in front of them, photographing her while she is naked and in various positions of bondage, whipping her while she is naked, inserting vegetables into her vagina, putting chains on her and sticking pins into her breasts.

The content of most of the magazines is also sado-masochistic in nature.

1. *Torment* depicts nude and partially clad women bound and suspended by ropes, chains and straps in contorted positions. Ropes and straps appear frequently in the genital area. Many of the women have tortured expressions on their faces. Welts, whether actual or simulated, appear on some of the women. The accompanying text deals exclusively with bondage and includes descriptions of the sexual pleasure which the sadistic party derives from forcing the victim to endure painful positions of bondage for long periods of time.

2. In *She ... Who Must Be Obeyed*, a woman is shown subjecting a nude man to bondage and whipping. Acts of violence to the man's genitals are also vividly depicted.

3. *Bottoms Up* chiefly depicts nude women being spanked with hands and with objects such as canes and whips. The buttocks of several of the women appear to be red and bruised as if flagellation were actually taking place. The stories involve the sexual gratification which both the abusers and victims receive from this bizarre activity.

4. In *Slave Training*, acts of abuse to male and female genitals are shown in cartoons and photographs. In several photographs, mousetraps and tourniquet devices are pictured on women's breasts. One woman's breasts have actually become purple due to tourniquets. The text focuses

---

**3.** Significantly, the exercise of describing these materials confirmed a fact that played some role in the Court's decision on these materials, namely, that language, however rich for some purposes, is simply unequal to the task of conveying to a reader what the visual images convey to the viewer. There is, no doubt, a large difference in communicative impact and effect between the written phrase "homosexual fellatio and anal intercourse" and the vivid *depiction of* it on video. For example, the latter might well be patently offensive, while the former may not. This difference in sensory impact should be taken into account in making judgments about the relevance and probative value of certain of defendants' preferred evidence.

on various forms of emotional and physical abuse, such as insertion of steel rings into a woman's nipples and caning of a man's penis.

5. *Tied Up* depicts naked and partially clad women in various states of bondage and includes several close-up photographs of women's genitals.

6. Finally, the photographs in *Super Bitch* depict female domination and male submissiveness.

The remaining three magazines contain graphic depictions of female genitals. *Tender Shavers* shows young women shaving their pubic hair and masturbating. Whether some of the models are adults or juveniles is unclear. Bobby socks, ponytails and makeup are employed to underscore, if not create, the appearance of adolescence, presumably to appeal to hedophiles. *Crotches* contains prominent, almost clinical, displays of young women's genitals. The accompanying text makes clear that the reader is supposed to believe that the models are teenage girls. The last magazine, *Poppin Mamas*, depicts naked pregnant women in lascivious poses.[4]

### A. *Public Opinion Poll*

Defendants attempted to introduce into evidence the results of a public opinion survey to demonstrate the community's attitude, toleration or standards with regard to sexually explicit materials. At the direction of John B. McConahay, Ph. D.,[5] a public opinion survey firm conducted the poll through telephone calls. After asking preliminary questions about the extent of the interviewee's involvement in the community, the interviewers were directed to say:

The next few questions deal with X-rated videos and adult movies and magazines. The nudity and sex shown in these types of adult materials include: nude bodies

and close-up, graphic depictions of a variety of sexual activities, including: sexual intercourse, ejaculation, bondage, oral sex, anal sex, group sex and variations of these by adult performers.

Each respondent was then asked 1) whether he thought that the portrayal of "nudity and sex" in materials available to adults only had become more or less acceptable in recent years; 2) whether he agreed or disagreed with the statement that adults who want to should be able to obtain and view materials depicting "nudity and sex;" 3) whether he believed that he should be able to buy or rent materials depicting "nudity and sex;" and 4) whether he agreed or disagreed with the statement that adults who want to should not be able to buy or rent materials depicting "sex and nudity."

The government objected to the introduction of this survey on the grounds that it was both irrelevant to the issues in this case and methodologically flawed. After examining the poll, its methodology and results, the Court ruled that the proffered opinion poll was not relevant to whether the charged materials were obscene and therefore excluded evidence concerning the poll. The Court also concluded that even if relevant, the probative value of the poll was so slight that it was plainly outweighed by the unfair prejudicial effect the poll would have had. *See* Fed.R.Evid. 403.

Evidence concerning the poll was irrelevant because the pollster's questions were not designed to elicit information about whether there was community acceptance of the actual materials in question or similar materials. Rather, the questions focused more on the general political question whether adults should be able legally to obtain pornography. In other words, the poll's questions seemed designed to measure public opinion not on whether the charged materials were accepted in the

---

**4.** Not surprisingly, defendants did not argue at trial that the materials possessed serious literary, artistic, political or scientific value. *See Miller*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d 419.

The jury found the defendants guilty under 18 U.S.C. § 1465 as to all the materials at issue, with the exception of three magazines. A verdict

of not guilty was returned for *Super Bitch*. The jury was unable to reach a verdict as to *Crotches* and *Poppin Mamas*.

**5.** Dr. McConahay has a Ph.D. in social psychology and is an associate professor of policy sciences and psychology at Duke University.

community, but on whether the laws banning obscenity should be repealed.

■ Courts have recognized that properly conducted public opinion surveys may be useful in gauging community standards for the purposes of determining whether the materials at issue are obscene. *United States v. Various Articles of Merchandise, Seizure No. 170,* 750 F.2d 596, 599. (7th Cir.1984); *Commonwealth v. Trainor,* 344 Mass. 796, 374 N.E.2d 1216, 1220 (1978); *People v. Thomas,* 37 Ill.App.3d 320, 346 N.E.2d 190, 194–95 (1976). To be admissible, however, a public opinion poll must be relevant; it must ask questions concerning the materials involved in the case or works that are "clearly akin" to the charged materials. *Various Articles of Merchandise,* 750 F.2d at 599; *see also Flynt v. State,* 153 Ga.App. 232, 264 S.E.2d 669, 672, *cert. denied,* 449 U.S. 888, 101 S.Ct. 245, 66 L.Ed.2d 114 (1980). Moreover, the poll must address whether the interviewee believes that the materials at issue or similar materials depict nudity and sex in an acceptable manner. *Flynt,* 153 Ga.App. 232, 264 S.E.2d at 672; *Trainor,* 374 Mass. 796, 374 N.E.2d at 1222; *Commonwealth v. Mascolo,* 7 Mass.App.Ct. 275, 386 N.E.2d 1311, 1314 (1979). The poll here fails on both scores.

■ First, the poll did not question interviewees regarding the materials at issue or similar materials, but rather inquired into their opinions on the viewing of "nudity and sex," defined broadly. The respondents' opinions on whether the viewing of nudity and sex in the abstract has become more less acceptable or whether adults should be able to buy or rent material depicting "nudity and sex" are simply not relevant to the question whether depictions such as those at issue are actually accepted in the community. *Flynt,* 153 Ga.App. 232, 264 S.E.2d at 672. The Court has viewed all of these materials and is confident that descriptive language fails to convey the impact of the visual image. For example, the term "bondage" in the poll's definition

of "nudity and sex" simply does not adequately describe the sexual and physical abuse depicted in many of the magazines and in the film "Punishment of Anne." There are no terms in the definition which inform the respondent that he or she is being questioned about materials which show, *inter alia,* (i) women's breasts and men's genitals in tourniquet devices; (ii) close-up photographs of pregnant womens' genitals with text describing the promiscuity of these women; (iii) insertion of a large pipe into a woman's anus; (iv) anal intercourse between she-males and men; and (v) a nude woman's breasts being repeatedly jabbed and punctured by pins while she hangs in chains.

Whatever the defendants' poll may show about the community's desire to overturn the obscenity laws as they relate to the depiction of "nudity and sex," it is not probative on whether the charged materials enjoy community acceptance. As the Georgia Court of Appeals noted in *Flynt v. State,* where evidence of a public opinion poll was excluded:

> The survey questions merely inquired as to general opinions concerning the depiction of "nudity and sex," defined as "exposure of the genitals and sexual activity," and whether adults should have the opportunity to obtain such materials. … Whether or not 76 of 100 persons would say that the change in "standards" over recent years in the depiction of nudity and sexual activities is "more acceptable" does not show that those same persons would find that the [materials] in question depicted sex and nudity in an "acceptable" manner. There was no attempt in the survey itself to determine whether the respondents were of the opinion that the contents of the [materials at issue] would or would not exceed the limits of permissible candor in the depiction of "nudity and sex."

153 Ga.App. 232, 264 S.E.2d at 672.[6] Thus, because interviewees were not sufficiently apprised of the nature of the charged mate-

---

6.  *But see Saliba v. State,* 475 N.E.2d 1181, 1186–87 (Ind.Ct.App.), *transfer denied,* 484 N.E.2d 1295 (Ind.1985); *Carlock v. State,* 609 S.W.2d 787, 789–90 (Tex.Crim.App.1980); *People v. Nelson,* 88 Ill.App.3d 196, 43 Ill.Dec. 476, 478, 410 N.E.2d 476, 478 (1980).

rials, the responses to the poll were irrelevant to the issues involved in this case.

Second, the questions were not directed at determining whether sexually explicit material enjoys community acceptance. The fact that depictions of nudity and sex may have become more acceptable in recent years does not bear on whether the average adult person in the community, applying contemporary community standards, would find that the charged materials appeal to the prurient interest or are patently offensive.[7] *Id.; see also Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d 419 (1973) (test for obscenity); *Smith v. United States,* 431 U.S. 291, 300–301 & n. 6, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977) (discussing concept of contemporary community standards). Whether the respondents believe that adults should be able to obtain sexually explicit magazines and videos is similarly irrelevant. *Flynt,* 153 Ga.App. 232, 264 S.E.2d at 672; *Trainor,* 374 Mass. 796, 374 N.E.2d 1216, 1222; *Thomas,* 37 Ill.App.3d 320, 346 N.E.2d 190, 195.

In *People v. Thomas,* 37 Ill.App.3d 320, 346 N.E.2d 190, the court, in excluding the results of a questionnaire filled out by theater patrons after they had viewed the movie at issue, held that the question "Did you feel consenting adults 18 years and older have a right to view films of this type?" was irrelevant.[8] *Id.,* 346 N.E.2d at 194, 195. And in *Commonwealth v. Trainor,* 374 Mass. 796, 374 N.E.2d 1216, another case in which survey data were held inadmissible, the court stated:

[W]e note the absence of any indication that the willingness, the lack of willingness, or the indifference of [the survey] group to the sale of sexually explicit magazines or the showing of sexually explicit films has any relevance to any issue material to this case. ... The offer of proof made no attempt to connect an acceptance of, or an indifference to, the showing or sale of [the material which interviewees were questioned about] with whether the particular sexual conduct involved in this case was depicted or described in a patently offensive way. Perhaps many people would not object to others' seeing such material, although they themselves regard that material as patently offensive.

*Id.,* 374 N.E.2d at 1222.

Community acceptance is the touchstone of admissibility. It is axiomatic that community tolerance or availability does not equate with acceptability.[9] To have admitted the poll would have been to ignore this principle. By asking whether adults "should be able to" view materials depicting nudity and sex, the poll also improperly invited interviewees to disregard existing statutory restrictions on the sale and distribution of obscenity. *See United States v. Various Articles of Obscene Merchandise, Schedule No. 2102,* 678 F.2d 433, 434–35 (2d Cir.1982) (community's view on wisdom and desirability of governmental restrictions on obscenity is irrelevant to the deter-

---

**7.** Even defendants' authorities support this point. In *People v. Nelson,* 88 Ill.App.3d 196, 43 Ill.Dec. 476, 410 N.E.2d 476 (1980), the court admitted the results of a poll which focused on the interviewees' opinions concerning the *acceptability* of viewing and disseminating sexually explicit materials. *Id.,* 43 Ill.Dec. at 478, 480, 410 N.E.2d at 478, 480; *see also Saliba v. State,* 475 N.E.2d 1181, 1186, 1191 (Ind.Ct.App.1985) (same), *transfer denied,* 484 N.E.2d 1295 (Ind. 1985).

**8.** The court also found that the method of conducting the poll was flawed. *People v. Thomas,* 37 Ill.App.3d 320, 346 N.E.2d 190, 195.

**9.** *Smith v. United States,* 431 U.S. at 297–98, 97 S.Ct. at 1761–62 (upholding jury instruction stating that contemporary community standards are set by what is in fact accepted in the community as a whole); *Hamling v. United States,*

418 U.S. 87, 125–26, 94 S.Ct. 2887, 2911–12, 41 L.Ed.2d 590 (1974) (availability of materials similar to those defendant is charged with circulating does not automatically mean that charged materials are not obscene); *United States v. Battista,* 646 F.2d 237, 245 (6th Cir.) (community acceptance rather than community tolerance is the correct measure of obscenity), *cert. denied,* 454 U.S. 1046, 102 S.Ct. 586, 70 L.Ed.2d 488 (1981); *United States v. Manarite,* 448 F.2d 583, 593 (2d Cir.) ("[e]vidence of mere availability of similar materials is not by itself sufficiently probative of community standards to be admissible in the absence of proof that the material enjoys a reasonable degree of community acceptance"), *cert. denied,* 404 U.S. 947, 92 S.Ct. 281, 30 L.Ed.2d 264 (1971).

mination of obscenity). The poll was irrelevant and therefore inadmissible.

■ Even if the poll's results were marginally relevant, the probative value of this evidence was substantially outweighed by the danger that it would have been unfairly prejudicial to the United States, would have confused the issues and would have misled the jury. *See* Fed.R.Evid. 403; *United States v. Milstead,* 671 F.2d 950, 953 (5th Cir.1982) (evidence may be excluded under Rule 403 if unfairly prejudicial to government). As shown, the poll's evidentiary value was, if not nonexistent, minimal because it did not adequately explain to interviewees the content of the charged materials and did not focus on the acceptability of such material.

These same shortcomings would have led to prejudice and confusion had testimony regarding the poll been admitted. The United States would not have been able to cross-examine the interviewees concerning their understanding of the poll's definition of "nudity and sex." Further, because the poll focused on whether adults should have the right to purchase material depicting "nudity and sex," the jury's attention would have been diverted from the central issue of community acceptance of the charged materials to the larger political question whether the law should be changed to protect obscenity. Introduction of the poll's results would also have created the unfair and incorrect inference that obscenity is to be measured by the community's tolerance of sexually explicit material, rather than its acceptance of such material. The Court therefore struck the Rule 403 balance in favor of exclusion. *See United States v. MacDonald,* 688 F.2d 224, 227 (4th Cir.1982) ("appraisal of the probative and prejudicial value of evidence under Rule 403 is entrusted to the sound discretion of the trial judge"), *cert. denied,* 459

U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983); *see also United States v. Layton,* 767 F.2d 549, 553–55 (9th Cir.1985) (district court enjoys wide discretion in performing Rule 403 weighing process).

## B. *Ethnography*

### 1. *Admissibility of Expert Testimony in Obscenity Cases*

■ We start with the Supreme Court's teachings in *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). There, the Court held that there is no constitutional need for expert testimony on the issue of obscenity once the challenged materials are placed into evidence. This is so because the materials themselves are the best evidence of what they represent. *Id.* at 56, 93 S.Ct. at 2634–35, *cited in Hamling v. United States,* 418 U.S. 87, 102, 94 S.Ct. 2887, 2899–2900, 41 L.Ed.2d 590 (1974). Indeed, the subject of obscenity does not lend itself to the traditional use of expert testimony because such testimony is usually admitted only to explain to jurors what they otherwise would not understand. *See Paris Adult,* 413 U.S. at 56, 93 S.Ct. at 2634–35. As stated in *Paris Adult,* "no such assistance is needed by jurors in obscenity cases." 413 U.S. at 56, 93 S.Ct. at 2634; *see also Ginzburg v. United States,* 383 U.S. 463, 465, 86 S.Ct. 942, 944–45, 16 L.Ed.2d 31 (1966). But this does not mean that expert testimony is *per se* inadmissible in obscenity cases.[10] On the contrary, the Supreme Court has held that the defendant can introduce competent, relevant, and appropriate expert testimony. *Kaplan v. California,* 413 U.S. 115, 121, 93 S.Ct. 2680, 2685, 37 L.Ed.2d 492 (1973) (citing *Smith v. California,* 361 U.S. 147, 160, 80 S.Ct. 215, 222–23, 4 L.Ed. 2d 205 (1959) (Frankfurter, J., concurring)).

---

10. In *Sedelbauer v. State,* 455 N.E.2d 1159 (Ind. Ct.App.1983), the appellate court held that whether materials are obscene can be determined by viewing them, thus expert testimony is not required. Accordingly, the court held that the trial court properly exercised its discretion in excluding all expert testimony and allowing the jury to determine contemporary community standards as an issue of fact. 455 N.E.2d at

1164. "While the United States Supreme Court has recognized that expert opinion *may* be used to define contemporary community standards, it has never *required* such in obscenity cases. ... The trial court's refus[al] to admit *any* testimony on community standards ... [did] not amount to a denial of due process." 455 N.E.2d at 1165 (emphasis in original).

[It is] the right of one charged with obscenity—a right implicit in the very nature of the legal concept of obscenity—to enlighten the judgment of the tribunal, be it the jury or ... the judge, regarding the prevailing literary and moral community standards and to do so through qualified experts.

*Smith,* 361 U.S. at 164, 80 S.Ct. at 224–25 (Frankfurter, J., concurring). So expert testimony is not *per se* inadmissible in obscenity trials. In appropriate cases, it is admissible. The question is whether this was such an appropriate case.

### 2. *Testimony of Dr. Scott*

Defendants sought to introduce the testimony of Dr. Joseph Scott, a sociologist with a background in statistical methodology. Dr. Scott conducted an "ethnographical" study which allegedly showed that the materials here in question are accepted by the adult community in the Alexandria division. According to Dr. Scott, an ethnographic study "looks at what is going on in the community." *State v. Anderson,* 85 N.C.App. 104, 354 S.E.2d 264, 267 (1987). To get a look at "what is going on" in the Alexandria Division of the Eastern District of Virginia, Dr. Scott did the following:

(1) He viewed the subject materials.

(2) He "probably went" to eighty or ninety bookstores, approximately sixty-nine of which sold what Dr. Scott described as "male sophisticate" magazines. He also visited about seventy-five video stores, of which forty-three sold adult videotapes.

(3) He talked to the operators and customers of the stores he visited about sexually explicit (male sophisticate) materials.

(4) He called newspaper editors and discussed with them the number and content of "letters to the editors" to ascertain the number and type of complaints relating to sexually explicit material.

As a result of this "ethnography," Dr. Scott was prepared to offer the jury his opinion that the "overwhelming majority" of adults in the community have at one time or another viewed sexually explicit material and that such materials, including the materials here in question, are readily acceptable by the average adult in the community. He prepared no report; he had only his notes. To reach his sweeping conclusion, Dr. Scott, who has never lived in Virginia, required only eight days.[11]

The issue is whether such testimony is competent expert evidence of the prevailing community standards.[12] It is not. Such testimony is inadmissible, for it is unreliable, unfairly prejudicial, and confusing and misleading to the jury.

### 3. *Analysis*

Under Rule 702 of the Federal Rules of Evidence, expert testimony is admissible only where (i) the witness is *qualified* as an expert, *see* Fed.R.Evid. 104(a), and (ii) the testimony will assist the jury in determining a fact in issue. It is within the discretion of the trial court to determine whether these requirements are met. *See Salem v. U.S. Lines Co.,* 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); *United States v. Trice,* 476 F.2d 89 (9th Cir.1973). In obscenity trials, it is well-settled that the trial court retains "wide discretion in its

---

**11.** During those eight days, Dr. Scott was assisted by an employee of defendant Dennis Pryba. This employee assisted in choosing the video and book stores that Scott visited during his "study" and chauffered Dr. Scott to these various stores.

**12.** Dr. Scott conceded that ethnography is a new approach to the study of community acceptance of sexually explicit material, but claimed that it is generally accepted in the social science field. Yet general acceptance of ethnography in the social sciences, even if true, does not mean that Dr. Scott's ethnography in this case qualifies him as an expert in the contemporary community standards of the Alexandria Division. *Cf. Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). The problem here is that Dr. Scott's ethnography is not scientific in the sense understood in *Frye.* There is a difference between scientific studies and methodologies in the natural sciences and studies found acceptable in the social sciences. The former must typically meet more rigorous standards and be subject to reliable replication. Put more directly, Dr. Scott's interviews of adult video store clerks, store managers, and customers over an eight-day period is simply not science.

determination to admit and exclude evidence, and this is particularly true in the case of expert testimony." *Hamling v. United States*, 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974). Also well-settled is that it is the defendants' burden to show admissibility. *Womack v. United States*, 294 F.2d 204, 206 (D.C.Cir. 1961). Here, the defendants have failed to meet their burden; here, the evidence sought to be introduced is inadmissible because (i) Dr. Scott is not qualified to offer an opinion as to contemporary community standards of obscenity in the Alexandria Division, and (ii) even if Dr. Scott is qualified, the evidence is unfairly prejudicial and misleading to the jury.

#### (a) *Rule 104(a): Witness Must be Qualified*

▆ The Court holds that the bases of Dr. Scott's opinion are insufficient to qualify him as an expert either on contemporary community standards of obscenity in the Alexandria Division, or on the question whether the materials in issue are accepted by the community. Dr. Scott admits that ethnography is a "new approach" in the study of sexual mores.[13] He described ethnography as a qualitative analysis of a community, a method used to "assess" community standards. "Ethnography is the work of describing a culture." J. Spradley, The Ethnographic Interview 3

(1979). The issue is whether Scott's ethnographic evidence properly reflects contemporary community standards.[14] It does not. Stripped of its scientific disguise, Dr. Scott's so-called "ethnography" is shown to be nothing more than a series of interviews with dealers of sexually explicit materials and their customers. This is neither science, nor work requiring expertise. Moreover, Scott did not visit churches, community centers, garden clubs, Rotary Clubs or the like to develop a basis for his opinion. Also, Dr. Scott did not show the films or magazines here in issue to those whom he interviewed, but instead discussed only those sexually explicit materials sold in the stores that he visited. In sum, defendants have failed to establish how Scott's ethnography is related to the general community's acceptance of the specific materials in issue.[15]

In essence, defendants seek to introduce, through the testimony of Dr. Scott, community acceptance of allegedly *comparable* material. While expert testimony may serve as a substitute for voluminous comparable evidence,[16] there is no evidence that the materials Scott examined and "discussed" with interviewees met the test of comparability as set forth in *Womack v. United States*, 294 F.2d 204 (D.C.Cir.1961). In *Womack*, the trial judge refused to admit into evidence dozens of books and mag-

13. The Court's research has uncovered only one case in which an ethnographic study of obscenity was cited. In *Parmelee v. United States*, 113 F.2d 729 (D.C.Cir.1940), Associate Justice Miller cited Schroeder, "Obscene" Literature and Constitutional Law (1911) c. XIII, Ethnographic Study of Modesty and Obscenity, as general support for the proposition that nudity is not obscene per se. *Id.* at 734 n. 17.

14. There is but one reported case in which an ethnographic study was offered as evidence of contemporary community standards in an obscenity case. *State v. Anderson*, 85 N.C.App. 104, 354 S.E.2d 264 (1987). Indeed, the few cases that discuss this science concern its application to the study of different *cultures,* such as peyotism and the Peyote Cult, *Oliver v. Udall,* 306 F.2d 819 (D.C.Cir.1962); the social system of the Rastafarians, *Robinson v. Foti,* 527 F.Supp. 1111 (E.D.La.1981); and evidence that Armenians are white persons so as to be eligible for naturalization as American citizens, *United States v. Cartozian,* 6 F.2d 919 (D.Or.1925).

15. For a case in which a similar result was reached see *Albright v. State,* 501 N.E.2d 488 (Ind.Ct.App.1986), where the court held inadmissible expert testimony on contemporary community standards. There, defendant's "expert" was a certified sex therapist who lived and practiced in the relevant community and who examined 200 patients over a three year period, 60 of whom had sexual dysfunctions. The intermediate appellate court upheld the exclusion of such testimony stating that the testimony failed to show "[a] basis for forming an opinion as to the general community's attitudes toward sexually explicit material." 501 N.E.2d at 493.

16. *Commonwealth v. United Books, Inc.,* 389 Mass. 888, 453 N.E.2d 406, 412 n. 4 (1983) ("The importance of expert testimony in an obscenity case is also demonstrated by the fact that it can serve as a substitute for voluminous comparative evidence.") (citing *Hamling v. United States,* 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974)).

azines depicting nudes. The D.C. Circuit affirmed the exclusion, holding that such evidence was immaterial, irrelevant, and of no probative value as it was not comparable to the materials in issue. 294 F.2d at 206. The court stated that for comparable evidence to be admissible, the defendant must show (i) that the two types of matter are similar, and (ii) that the materials to be introduced have a "reasonable degree of community acceptance." *Id.* Here, there was no evidence that the "male sophisticate" material Scott examined and discussed was comparable to the materials in issue. Indeed, many of the tapes and magazines that Scott used in his study had been found not comparable by this Court.[17] Accordingly, the Court will not allow defendants to introduce circuitously that which has already been declared inadmissible.

Also, Scott's testimony must be excluded because it is predicated solely upon qualitative rather than quantitative analysis.[18]

Scott's analysis, *i.e.*, talking to customers and vendors of sexually explicit material and reviewing letters to the editors of various publications, in no way demonstrates community acceptance of the materials here in issue. Scott's testimony, although perhaps reflecting availability of the materials surveyed, fails to evidence community acceptance. It is well-settled that mere availability does not equate with community acceptance. *See infra* note 9 and accompanying text. Scott offers no *quantitative* analysis for much of his male sophisticate material, such as sale or distribution figures, which might have been probative of community acceptance.[19] Dr. Scott's ethnography, in essence, constitutes nothing more than a one-man, eight-day, unscientific poll of purveyors and purchasers of smut. To permit this so-called "study" to masquerade as expert testimony on Northern Virginia's contemporary community standards of obscenity is ludicrous.[20] This "study" did not and could not make

---

**17.** The Court examined a substantial number of tapes and magazines proffered by defendants as comparable to the charged materials. On the basis of *Womack v. United States,* 294 F.2d 204 (D.C.Cir.1961) (whether proffered materials are comparable is a question for the court), the Court concluded that much of the material was not comparable in content.

**18.** There is authority that qualitative expert testimony in obscenity cases may be admissible, but this authority is not persuasive. In *Commonwealth v. United Books,* 389 Mass. 888, 453 N.E.2d 406 (1983), it was held that the trial court erred in excluding defendant's proffered expert testimony on the artistic value of the materials in issue. There, however, the evidence was uncontroverted that the expert was a professor of English and an affiliate professor of Biology at Clark University in Worcester, Massachusetts, (the community standard to be applied was that of Massachusetts), that he had been a professor there for twenty years, that he had taught a course surveying erotic art over the centuries, that he had taught over 100 students in this course and was familiar with their views on erotic art, that the course dealt in part with the nature of erotic expression in Massachusetts, and that he also did independent investigation in the Worcester area to study erotic art. 453 N.E.2d at 412–13. *See also State v. Hull,* 86 Wash.2d 527, 541–42, 546 P.2d 912, 920 (1976) (admission of expert testimony of a psychiatrist regarding contemporary community standards did not constitute reversible error where psychiatrist conducted a five and one-half year study on the moral attitudes of resi-

dents pertaining to sexually explicit material). But in each of these cases there was, unlike the instant case, an adequate basis for the expert's opinion. *Compare United Books,* 453 N.E.2d 406 *and Hull,* 546 P.2d 912 *with Albright v. State, supra* note 14.

**19.** There were two magazines, however, for which Scott did proffer some sales and distribution figures. The Court examined these magazines and found them to be comparable to the charged materials. Accordingly, the Court permitted Dr. Scott to testify as to that material, but defendants declined to present such testimony.

**20.** *But see State v. Anderson,* 85 N.C.App. 104, 354 S.E.2d 264 (1987). In *Anderson,* the defendant was convicted of dealing in obscenity. The North Carolina Court of Appeals held that the trial court's exclusion of Dr. Scott's testimony was erroneous and that defendant was entitled to a new trial. There, Dr. Scott performed an ethnographic study similar to the one here in issue. The North Carolina intermediate appellate court stated that while some of Dr. Scott's methods could be said to demonstrate mere availibility, the court "[did] not believe that the study [was] so entirely flawed as to render [Scott's] opinion on patent offensiveness wholly irrelevant and inadmissible." *Id.* 354 S.E.2d at 269. *Anderson,* however, is not persuasive, and the Court declines to follow the rationale of the intermediate appellate court. *Anderson* is currently on appeal before the North Carolina Supreme Court.

Dr. Scott a competent, reliable expert on the contemporary community standards on sexually explicit material in Northern Virginia. Accordingly, the Court excluded Dr. Scott's testimony as falling far short of even minimal standards under Rules 702 and 104 of the Federal Rules of Evidence.

### (b) *Rule 403 Analysis*

 Even assuming that Dr. Scott is qualified as an expert, his testimony warranted exclusion under Fed.R.Evid. 403. Expert testimony is, of course, subject to the balancing test of Rule 403, under which probative value is measured against prejudicial effect. In criminal cases the 403 balancing test is usually applied to insure that the defendant is not unfairly prejudiced, yet the prosecution is also entitled to such protection. *See, e.g., United States v. Milstead,* 671 F.2d 950 (5th Cir.1982). In applying the balancing test, the trial court is accorded broad discretion. *See Garraghty v. Jordan,* 830 F.2d 1295, 1298 (4th Cir.1987); *United States v. Penello,* 668 F.2d 789, 790 (4th Cir.1982); *see also United States v. Lowe,* 569 F.2d 1113 (10th Cir.1978). Here, Dr. Scott's testimony must be excluded under Rule 403 for its probative value, if any, is outweighed by the danger of unfair prejudice and jury confusion.

Scott's testimony has little or no probative value because, as discussed, (i) he is not familiar with the Alexandria Division and spent only eight days here, (ii) he interviewed only dealers and purchasers of "adult sophisticate" materials and in these interviews failed to discuss any video or magazine here in issue, and (iii) his discussions with various newspaper editors on "letters to the editors" regarding obscenity in no way indicate that the materials here are accepted by the community. Scott's ethnography, if read generously, could conceivably be probative of community acceptance of noncomparable sexually explicit material. But this evidence, although limited in probative value, would have been unfairly prejudical because Dr. Scott's analysis is based largely on hearsay and the United States would not have been able to cross-examine the interviewees concern-

ing their understanding of Scott's questions. Further, Scott's testimony, being clothed in the guise of expert testimony, would have diverted the jury's attention from the issue of community acceptance of the charged materials to the issue of community acceptance of noncomparable materials. *See generally United States v. Addison,* 498 F.2d 741, 744 (D.C.Cir.1974) (scientific evidence may "assume a posture of mythic infallibility in the eyes of a jury of laymen"); *United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir.1973) (expert testimony excluded because of potentially prejudicial effect on the jury arising from the "aura of special reliability and trustworthiness" of scientific expert testimony). Accordingly, Scott's testimony was excluded.