900 F.2d 748
 58 USLW 2624, 30 Fed. R. Evid. Serv. 439
 UNITED STATES of America, Plaintiff-Appellee,
v.
Dennis E. PRYBA, Defendant-Appellant,
PHE, Inc., Amicus Curiae.
UNITED STATES of America, Plaintiff-Appellee,
v.
Barbara A. PRYBA, Defendant-Appellant,
PHE, Inc., Amicus Curiae.
UNITED STATES of America, Plaintiff-Appellee,
v.
EDUCATIONAL BOOKS, INC., Defendant-Appellant,
PHE, Inc., Amicus Curiae.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jennifer G. WILLIAMS, Defendant-Appellant,
PHE, Inc., Amicus Curiae.
 Nos. 88-5001 to 88-5004.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 4, 1989.
Decided April 9, 1990.
As Amended May 1, 1990.
 
 Paul J. Cambria, Jr. (Cherie L. Peterson, on brief), Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N.Y., (Plata Cacheris, Cacheris & Towey, on brief, Washington, D.C.), for appellants.
 William Graham Otis, Lawrence J. Leiser, Asst. U.S. Attys. (Henry E. Hudson, U.S. Atty., on brief), Alexandria, Va., for appellee.
 Donald B. Verrilli, Jr., David W. Ogden, Bruce J. Ennis, Jenner & Block, Washington, D.C., for amicus curiae.
 Before RUSSELL, WIDENER, and CHAPMAN, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 Following a jury trial, appellants were convicted of various offenses relating to the sale of obscene video tapes and obscene magazines. Dennis E. Pryba and Barbara A. Pryba, husband and wife, were each convicted of one count of violating 18 U.S.C. Sec. 1962(a) (participating in a pattern of racketeering activity); one count of violating 18 U.S.C. Sec. 1962(c) (employed by a criminal enterprise engaged in racketeering activities); one count of violating 18 U.S.C. Sec. 1962(d) (conspiracy to violate Sec. 1962(a)); and seven counts of violating 18 U.S.C. Secs. 1465 and 2 (transportation of obscene materials in interstate commerce for sale and distribution). Jennifer G. Williams was acquitted on Count I, violation of Sec. 1962(a), but convicted of all of the remaining counts. Educational Books, Inc. was convicted of one count of violating 18 U.S.C. Sec. 1962(a) and one count of violating 18 U.S.C. Sec. 1962(d). All defendants appeal their judgments of conviction and they raise constitutional challenges to the forfeiture provisions of the federal RICO statute, the use of the prior state obscenity convictions of Educational Books, Inc. to prove predicate acts of racketeering, and various rulings made by the trial court in the admission of evidence and in the voir dire examination of prospective jurors. After a careful consideration of the record, the briefs, and the oral argument, we affirm.
 
 
 2
 * Dennis E. Pryba and Barbara A. Pryba owned corporations which operated nine video rental stores and three bookstores in Northern Virginia. The corporations B & D Corporation and Educational Books, Inc. operated Video Rental Center Stores which stocked inventories of general audience video tapes and sexually explicit adult video tapes. Although the Prybas owned the stock in the corporations, they were never listed as officers or directors, because Mr. Pryba stated that he wanted to disguise who was actually in charge in the event of trouble with the police. Jennifer Williams was a long-time employee and bookkeeper, and was listed as president of B & D Corporation. She performed numerous services for the corporation, although she argues that her role was so minimal that the proof was insufficient to convict her.
 
 
 3
 The Video Rental Center Stores also stocked rubber goods, "marital aids," and "peek booths" through which one could view two or three minutes of sexually explicit tape upon payment of a quarter. The heart of the government's case consisted of the introduction of the tapes and magazines that were alleged to be obscene. The indictments were brought following an obscenity investigation during which investigators opened memberships with video retail centers and rented or purchased sexually explicit video tapes and magazines. At trial the jury found six of the nine magazines to be obscene and four video tapes that had been rented or purchased to be obscene. The content of this material is accurately and unemotionally described by the district judge in United States v. Pryba, 678 F.Supp. 1225, 1227-28 (E.D.Va.1988):
 
 
 4
 1. She-Male Confidential, Bizarre Encounter # 9. This video depicts a variety of sexual activities involving "she-males"--persons who have female bodies, including fully developed breasts. They are women in all respects save one: they have male genitalia. In the first scene, two she-males dressed as women engage in fellatio and anal intercourse with a man. The second vignette depicts a she-male inserting what appears to be a large pipe into a woman's anus. The she-male and the woman also engage in vaginal and anal intercourse. The third scene captioned "Spanked by a Stranger," shows a man throwing a she-male to the ground and performing fellatio upon the she-male. The man then has anal intercourse with the she-male.
 
 
 5
 2. Wet Shots. This video features men and women engaged in vaginal and anal intercourse and oral sex. Many of the scenes involve groups of men and women. The film also contains close-up depictions of male ejaculations on the bodies and faces of others. In one scene, men are shown ejaculating into a glass of liqueur. A woman then drinks the mixture.
 
 
 6
 3. The Girls of the A-Team. This film, as the title might suggest, is devoted chiefly to showing anal intercourse between men and women, in couples and in groups. The film also depicts a variety of other sexual activities between women in couples and larger groups, including vaginal and anal insertion of a range of objects.
 
 
 7
 4. The Punishment of Anne. This video predictably has a sado-masochistic theme. A woman and a man subject a younger woman to various forms of degradation, including forcing her to urinate in front of them, photographing her while she is naked and in various positions of bondage, whipping her while she is naked, inserting vegetables into her vagina, putting chains on her and sticking pins into her breasts.
 
 
 8
 The content of most of the magazines is also sado-masochistic in nature.
 
 
 9
 1. Torment depicts nude and partially clad women bound and suspended by ropes, chains and straps in contorted positions. Ropes and straps appear frequently in the genital area. Many of the women have tortured expressions on their faces. Welts, whether actual or simulated, appear on some of the women. The accompanying text deals exclusively with bondage and includes descriptions of the sexual pleasure which the sadistic party derives from forcing the victim to endure painful positions of bondage for long periods of time.
 
 
 10
 2. In She ... Who Must be Obeyed, a women is shown subjecting a nude man to bondage and whipping. Acts of violence to the man's genitals are also vividly depicted.
 
 
 11
 3. Bottoms Up chiefly depicts nude women being spanked with hands and with objects such as canes and whips. The buttocks of several of the women appear to be red and bruised as if flagellation were actually taking place. The stories involve the sexual gratification which both the abusers and victims receive from this bizarre activity.
 
 
 12
 4. In Slave Training, acts of abuse to male and female genitals are shown in cartoons and photographs. In several photographs, mousetraps and tourniquet devices are pictured on women's breasts. One woman's breasts have actually become purple due to tourniquets. The text focuses on various forms of emotional and physical abuse, such as insertion of steel rings into a woman's nipples and caning of a man's penis.
 
 
 13
 5. Tied Up depicts naked and partially clad women in various states of bondage and includes several close-up photographs of women's genitals.
 
 
 14
 6. Finally, the photographs in Super Bitch depict female domination and male submissiveness.
 
 
 15
 The remaining three magazines contain graphic depictions of female genitals. Tender Shavers shows young women shaving their pubic hair and masturbating. Whether some of the models are adults or juveniles is unclear. Bobby socks, ponytails and makeup are employed to underscore, if not create, the appearance of adolescence, presumably to appeal to hedophiles. Crotches contains prominent almost clinical, displays of young women's genitals. The accompanying text makes clear that the reader is supposed to believe that the models are teenage girls. The last magazine, Poppin Mamas, depicts naked pregnant women in lascivious poses.
 
 
 16
 The trial judge noted the difficulty of describing the visual impact of this material. At note 3, page 1227, he stated:
 
 
 17
 Significantly, the exercise of describing these materials confirmed a fact that played some role in the court's decision on these materials, namely, that language, however rich for some purposes, is simply unequal to the task of conveying to a reader what the visual images convey to the viewer. There is, no doubt, a large difference in communicative impact and effect between the written phrase "homosexual fellatio and anal intercourse" and the vivid depiction of it on video. For example, the latter might well be patently offensive, while the former may not. This difference in sensory impact should be taken into account in making judgments about the relevance and probative value of certain of defendants' proffered evidence.
 
 
 18
 The proffered evidence of defendants, which the court excluded, involved certain "public opinion surveys," which will be mentioned later in the opinion, and which the court excluded from evidence because they failed to adequately convey to the person being interviewed the true nature of the material in question.
 
 
 19
 The defendants also proffered an "ethnographic survey," that they maintained reflected the community acceptance of sexually explicit materials, including those described above. This evidence was excluded. None of appellants took the witness stand.
 
 
 20
 The jury acquitted as to Super Bitch, and could not reach a verdict on the magazines Crotches and Poppin Mamas. Id. at 1228 n. 4.
 
 
 21
 In its verdict the jury found that the video tapes entitled She-Male Confidential, Bizarre Encounter # 9, Wet Shots, Girls of the A-Team, and Punishment of Anne were obscene and that the magazines Torment, She ... Who Must be Obeyed, Bottoms up, Slave Training, Tied up, and Tender Shavers were obscene. Id.
 
 
 22
 Following the verdicts of conviction, Dennis Pryba was sentenced to three years imprisonment on Count I, ten years on Counts II and III, and five years each on Counts IV through X. The sentences on Counts II through X are to run concurrently with each other but consecutively to the three year sentence on Count I, but they were suspended in favor of five years probation. Dennis Pryba was also sentenced to pay a fine of $75,000 under Count II, and as a condition to probation following his prison term, he was directed to make monthly payments in satisfaction of unpaid fines previously imposed as a result of state convictions of his businesses.
 
 
 23
 Barbara Pryba was sentenced to suspended terms of three years imprisonment on Counts I and II and Counts IV through X, and to a suspended sentence of ten years on Count III. She was also sentenced to concurrent terms of three years probation on all counts and fined $200,000.
 
 
 24
 Educational Books, Inc. was sentenced to pay fines of $100,000 on each of Counts I and III. Jennifer Williams was sentenced to concurrent terms of three years imprisonment on Counts II through X and these terms were suspended and she was placed on probation for three years and fined $2,250.
 
 
 25
 Following the jury verdicts finding violations of 18 U.S.C. Sec. 1962(a), (c), and (d), the same jury heard an additional week of testimony on the issue of forfeiture under 18 U.S.C. Sec. 1963(a)(1). The jury found that defendants had certain interests in property which afforded them a source of influence over the enterprise and directed that all shares of stock in B & D Corporation, Educational Books, Inc., Marlboro News, Home Video Sales, Inc., and Video Shop, Ltd. be forfeited, together with corporate assets, certain real estate and motor vehicles. Upon this verdict, the court issued an order of forfeiture and the government immediately dispatched United States Marshals to padlock the doors of the three bookstores and nine video rental shops. The jury spared Mrs. Pryba's home and automobile from forfeiture. Appellants moved to stay the orders of forfeiture, and these motions were denied by the trial court, this court, and the United States Supreme Court.
 
 
 26
 Appellants argue that the forfeiture order resulted in the confiscation and restraint of a vast inventory of presumptively protected expressive material.[1] They also contend that, for the fiscal year ending September 30, 1986, the total sales of their businesses amounted to more than $2,000,000, and, as a result of the sale and rental of only $105.30 of material found to be obscene the government has shut down 12 expressive businesses by confiscating all of their inventories, including presumptively protected films and magazines.
 
 II
 
 27
 This case represents the first application of federal RICO forfeiture provisions in which obscenity violations are the predicate acts constituting the pattern of racketeering activity under 18 U.S.C. Sec. 1962. Defendants claim that the RICO statute and its forfeiture provisions violate the First Amendment when the predicate offenses are obscenity violations. In the Present case, the predicate offenses were the 15 prior obscenity convictions of the corporate defendant, and the sale and/or rental of four video tapes and six magazines, which were subsequently determined to be obscene.
 
 
 28
 Defendants argue that the RICO forfeiture provisions, as applied to racketeering activity consisting of obscenity violations, are an unconstitutional prior restraint of protected expression, have a chilling effect on constitutionally protected expression, and are overly broad in their application.
 
 
 29
 There is nothing so unusual about obscenity convictions that they may not be used as RICO predicate offenses. There is no constitutional protection for materials adjudged to be obscene. Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957) The appellants have no protected right to be free from prosecution for violating the federal obscenity statutes and the Supreme Court, in Fort Wayne Books, Inc. v. Indiana, 489 U.S. 46, 109 S.Ct. 916, 102 L.Ed.2d 34 (1989), held that substantive obscenity violations could serve as predicate offenses under the Indiana RICO statute which is patterned after the federal RICO statute. There is no merit to the claim that obscenity violations may not be RICO predicate offenses.
 
 III
 
 30
 The constitutionality of criminal sanctions against those who distribute obscene materials is well established. Pinkus v. United States, 436 U.S. 293, 98 S.Ct. 1808, 56 L.Ed.2d 293 (1978); Splawn v. California, 431 U.S. 595, 97 S.Ct. 1987, 52 L.Ed.2d 606 (1977); Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957). These sanctions may include imprisonment and fines. Smith v. United States, 431 U.S. 291, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977) (5 year prison term and $5,000 fine for first offense; 10 year prison term and $10,000 fine for each subsequent violation); United States v. Guglielmi, 819 F.2d 451 (4th Cir.1987), cert. denied, 484 U.S. 1019, 108 S.Ct. 731, 98 L.Ed.2d 679 (1988) (25 year prison term).
 
 
 31
 Appellants argue that the post-trial forfeiture of their properties following their convictions under RICO constitutes a prior restraint of their protected right of expression under the First Amendment. They contend that RICO forfeiture provisions violate the First Amendment because they lack the procedural safeguards necessary to insure that protected expression is not erroneously suppressed. They rely on Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and the three conditions it imposes on any attempt to suppress unprotected expression: (1) the government must bear the burden of proof that the material represents unprotected expression; (2) the exhibitor of the alleged unprotected expression must be assured, by either statute or authoritative judicial construction, of a prompt adversarial hearing and adjudication on the issue of obscenity; and (3) a statute must strictly limit the duration of any prior restraint device entered before judicial review.
 
 
 32
 Appellants argue that the statutory framework of RICO fails to meet these three requirements, because even though the government must prove at least two prior obscenity violations to establish a pattern of racketeering activity, RICO allows the government to restrain all remaining expressive material by seizure and forfeiture without first demonstrating its obscenity. They further contend that such restraint is not limited in duration, but is permanent, and that there is no judicial review and final adjudication of the forfeited material's obscenity. We do not find Freedman v. Maryland particularly helpful to a decision of the present case. It involved the Maryland Movie Censorship Law which required that films be submitted to the State Board of Censors for a license before a public showing. The statute's procedure placed the initial burden upon the exhibitor to prove that the film met the state standard. On our facts, appellants were not subject to a censorship board, they were convicted by a jury of violating obscenity statutes and of engaging in racketeering activities. This was an adversarial proceeding and it established beyond a reasonable doubt the obscenity of certain of defendants' stock in trade. Freedman did not involve, did not discuss, and has no application to RICO forfeitures. It involved a film that by the state's admission was not obscene and did not violate the standards set by the censorship statute.
 
 
 33
 In 1984 the RICO statute was amended by adding obscenity to the predicate offenses constituting "racketeering activity." Appellants argue that the legislative intent motivating this amendment was the desire to eliminate pornography and obscenity. This intent, coupled with the original intent of the forfeiture provisions of RICO, was to incapacitate a defendant from continuing the activity giving rise to the RICO violation by removing his economic wherewithal to continue. Appellants claim that the forfeitures at issue here have incapacitated them from future expression of any sort as a consequence of past acts of unprotected speech. This, they claim, is forbidden under Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).
 
 
 34
 Near is of no assistance. The factual situation and the law involved there were vastly different. In 1925, Minnesota passed a statute to abate, as a public nuisance, the publication of malicious, scandalous and defamatory newspapers, magazines and other periodicals. The law provided that there was available the defense that the truth was published "with good motives and for justifiable ends." Under the law, the County Attorney where the periodical was published or the State Attorney General, upon failure of the County Attorney to proceed, or a private citizen in the name of the state, upon failure of both the County Attorney and the Attorney General to proceed, could commence an action to perpetually enjoin the person committing or maintaining such nuisance from further committing or maintaining it. Near published "The Saturday Press." This publication contained articles stating that certain citizens, law enforcement officers and members of the County Grand Jury were turning a blind eye to gambling, bootlegging and racketeering in Minneapolis. The state court found that the publication was "largely devoted to malicious, scandalous and defamatory articles" within the meaning of the statute. It was held to be a public nuisance. The judgment perpetually enjoined Near from producing, editing, publishing, circulating, having in his possession, selling or giving away any publication which was malicious, scandalous or defamatory, and from conducting a business under the name of The Saturday Press or any other name. The Supreme Court struck down the statute and found it to be "the essence of censorship." Id. at 713, 51 S.Ct. at 630. Near involved a clear case of both censorship and prior restraint of publications containing news and comment on the news. It is difficult to imagine a situation more clearly protected by the First Amendment. Near has no application to obscenity, and sheds no light on the issues before us.
 
 
 35
 Appellants claim that RICO forfeiture curtails First Amendment rights when the predicate offenses are obscenity violations. However, it is not the predicate offenses that impact on First Amendment rights, but it is the forfeiture that may curtail speech impermissibly. There are specific statutes which establish crimes relating to the sale, transportation and mailing of obscene materials. See 18 U.S.C. Secs. 1460-1469. These statutes also provide imprisonment and fines upon conviction, and Sec. 1467 allows criminal forfeiture not only of obscene materials, but also any real or personal property traceable to the proceeds obtained from such offense and/or used to commit or to promote the commission of the offense.
 
 
 36
 Following the guilty verdicts of the defendants, evidence was presented for a week on the issue of forfeiture. A properly instructed jury unanimously decided upon an adequate record that the defendants owned or had an interest in the proceeds in the properties that were forfeited, and that the properties afforded defendants a source of influence over the enterprise that the defendants conducted in violation of 18 U.S.C. Sec. 1962.
 
 
 37
 The forfeiture provided by 18 U.S.C. Sec. 1467 does not violate the First Amendment even though certain materials, books and magazines, that are forfeited, may not be obscene and, in other circumstances, would have constitutional protection as free expression. There was a nexus established between defendants' ill gotten gains from their racketeering activities and the protected materials that were forfeited. The forfeiture did not occur until after defendants were convicted of violating various obscenity statutes and of participating in a racketeering activity, and until after it was established beyond a reasonable doubt that the proceeds from these criminal activities had been used to acquire the arguably protected publications.
 
 
 38
 The defendants may not launder their money derived from racketeering activities by investing it in bookstores, videos, magazines and other publications. The First Amendment may be used as a shield, but it is not a shield against criminal activity. To follow the defendants' argument would allow criminals to protect their loot by investing it in newspapers, magazines, radio and television stations. Carried to its logical end, this reasoning would allow the Colombian drug lords to protect their enormous profits by purchasing the New York Times or the Columbia Broadcasting System.
 
 
 39
 Defendants seek support from Fort Wayne Books, Inc. v. Indiana, supra, 489 U.S. 46, 109 S.Ct. 916, 102 L.Ed.2d 34, but this case is of no assistance to them. It involved the Indiana RICO statute and a civil action which authorized the court, following an ex parte hearing, to order the immediate seizure of a bookstore and its contents which were alleged to be used in the racketeering activity. The Supreme Court found that pretrial seizure of the bookstore and its contents was improper and that the books and films could not be taken out of circulation until there had been a determination of obscenity after an adversary hearing. Although defendants rely on Fort Wayne, it actually forecloses a number of their arguments. In deciding that the Indiana RICO statute, patterned after the federal RICO statute, was not unconstitutional because of the inclusion of substantive obscenity violations among the predicate offenses, the Court held that the use of RICO sanctions in racketeering based upon obscenity violations was not so "draconian" as to have a chilling effect upon First Amendment freedom, id. at ----, 109 S.Ct. at 925, and that the greater punishment under RICO was not constitutionally significant when compared with punishment available under obscenity statutes. Id. Fort Wayne did not reach the issue of post-trial forfeiture, but emphasized that the materials considered by the court prior to seizure were merely to establish probable cause and concluded that the Indiana procedure did not pass constitutional muster because the seized materials were expressive and presumed to be protected by the First Amendment, and that this presumption was not rebutted "until the claimed justification for seizing books or other publications is properly established in an adversary proceeding." Id. at ----, 109 S.Ct. at 929. In its final footnote, the majority opinion stated:
 
 
 40
 Although it is of no direct significance, we note that the federal government--which has a RICO statute similar to Indiana's, 18 U.S.C. Sec. 1961, et seq.--does not pursue pretrial seizure of expressive materials in its RICO actions against "adult bookstores" or like operations. See brief of United States as amicus curiae, 15, n. 12; cf. United States v. Pryba, 674 F.Supp. 1504, 1508, n. 16 (E.D.Va.1987).
 
 
 41
 Id. at ----, 109 S.Ct. at 930.
 
 
 42
 The forfeiture of nonobscene books, magazines and video tapes, after a conviction of racketeering involving the sale of obscene goods and after the jury has determined that the forfeited materials were acquired or maintained in violation of 18 U.S.C. Sec. 1962 and afforded the Prybas a source of influence over the racketeering enterprise, does not violate the First Amendment. The fact that some of the materials forfeited are not obscene does not protect them from forfeiture when the procedures established by RICO are followed, as they were in the present case.
 
 
 43
 Appellants argue that forfeiture of nonobscene materials has a chilling effect on their right of expression. This does not make forfeiture unconstitutional. Both a prison term and a large fine would have a chilling effect on the right of expression, but such penalties are constitutional. The Prybas were exposed to 35 years imprisonment plus a fine of $1,750,000 each without consideration of the RICO count. If imprisoned, their rights of expression would be restricted. It is doubtful that the business could survive fines of the amount authorized by statute, and this would in effect chill the right to sell presumptively protected material. However, this does not make the prison terms or the fines unconstitutional. The same reasoning applies to forfeitures.
 
 
 44
 This issue was presented in 511 Detroit Street, Inc. v. Kelley, 807 F.2d 1293 (6th Cir.1986), which involved the Michigan anti-obscenity law. The court noted a statement from the legislative history: "The best way to curtail dissemination of pornography is to make it unprofitable, hence the bill's provisions for fines of up to $5 million." Id. at 1298-99. The district court had found the act to be vague and overly broad and an impermissible restraint on protected speech. However, the circuit court stated:
 
 
 45
 Furthermore, the district court concluded that because a sentencing judge may look at total profits, from sales of both protected and obscene materials, in determining the appropriate fine under Section 5, protected material will be "penalized", for there will be no judicial determination of just how much of the total profits was derived from dissemination of obscene material.
 
 
 46
 We reject this contention. We refuse to hold that a statute threatening fines that could impair the operation of a business is an impermissible prior restraint on expression, even where that business also involves dissemination of protected materials. The fact that a person does some business disseminating protected materials cannot immunize that person from large fines that may be imposed for violation of criminal law.
 
 
 47
 Id. at 1299.
 
 
 48
 Appellants have beckoned us into a thicket of constitutional claims, asserting prior restraint, the chilling of free expression, and methods of regulating obscenity that are vague and overly broad, but we decline this invitation. Such an exercise is not necessary to resolve this case. Obscenity is not protected by the First Amendment and a convicted racketeer may not launder his dirty money by investing it in materials that involve protected speech.
 
 IV
 
 49
 The forfeiture of appellants' business assets was not cruel and unusual punishment or an excessive fine prohibited by the Eighth Amendment. In United States v. Guglielmi, 819 F.2d 451 (4th Cir.1987), cert. denied, 484 U.S. 1019, 108 S.Ct. 731, 98 L.Ed.2d 679 (1988), we approved a prison sentence of 25 years and a fine of $35,000 on conviction of five counts of interstate shipment of obscene materials.
 
 
 50
 Plaintiff argues that forfeiture of their properties upon conviction of their "minor crimes" is disproportionate. Even if we thought a proportional analysis was required, appellants have failed to proffer the information that would be required for such an undertaking. However, such an analysis is not required because appellants did not receive a sentence of sufficient severity to trigger a proportionality review. United States v. Whitehead, 849 F.2d 849, 860 (4th Cir.1988); United States v. Rhodes, 779 F.2d 1019, 1027-28 (4th Cir.1985), cert. denied, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986) (Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) does not require a proportionality review of any sentence less than life imprisonment without the possibility of parole.).
 
 V
 
 51
 At trial appellants sought to introduce a public opinion survey conducted through telephone calls by a professor of social sciences and psychology at Duke University. The survey was offered to demonstrate the community's attitude, toleration and standards with regard to sexually explicit materials. They also sought to introduce an "ethnographical" study by another sociologist, who testified that an "ethnological" study "looks at what is going on in the community." After an extended voir dire of these witnesses, the trial judge refused to admit the survey results or the testimony of these experts. After the trial the district court in a very scholarly and detailed opinion set forth his reasons for excluding this evidence. See United States v. Pryba, 678 F.Supp. 1225 (E.D.Va.1988). We adopt the reasoning of the district court and find the claim of error in refusing to admit these studies or this testimony to be without merit.
 
 
 52
 In Paris Adult Theater I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), the court found that the jury needed no assistance from experts on the issue of obscenity once the challenged materials are in evidence. In the present case, the basis of the district court's refusal to admit this evidence was his finding that the questions presented by the pollsters in conducting their surveys did not accurately and fully describe the challenged materials being sold by the appellants. Asking a person in a telephone interview as to whether one is offended by nudity, is a far cry from showing the materials previously described in this opinion, and then asking if they are offensive.
 
 
 53
 In dealing with the difficult question of describing obscenity, one takes comfort in the statement of Justice Stewart:
 
 
 54
 I have reached the conclusion, which I think is confirmed at least by negative implication in the court's decisions since Roth and Alberts [v. California, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) ], that under the First and Fourteenth Amendments criminal laws in this area are constitutionally limited to hard-core pornography. I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that.
 
 
 55
 Jacobellis v. Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (footnotes omitted).
 
 
 56
 The jurors in the present case saw the materials and found some of it to be obscene, some of it not to be obscene, and could not unanimously agree on certain materials. We agree with the district judge that the jurors would not have been helped by the proffered testimony.
 
 VI
 
 57
 The right of peremptory challenge is "one of the most important of the rights secured to the accused." Pointer v. United States, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894). However, the refusal of the district court in its extensive voir dire of prospective jurors to ask seven questions of the 117 questions (many with subparts) presented by appellants did not prejudice the appellants in the exercise of their challenges or in the ultimate selection of the jurors.
 
 
 58
 The trial judge went to great pains in reviewing all of the questions proposed, and found some to be overly intrusive. We do not find that he abused his discretion in this area. "It is well established that a trial court may exercise broad discretion in conducting the voir dire of the jury, and particularly in phrasing the questions to be asked." United States v. Jones, 608 F.2d 1004, 1007 (4th Cir.1979), cert. denied, 444 U.S. 1086, 100 S.Ct. 1046, 62 L.Ed.2d 773 (1980).
 
 VII
 
 59
 Appellants contend that the trial court improperly admitted into evidence the 15 prior state court obscenity convictions of defendant Educational Books, Inc. Its argument that the government cannot prove predicate acts by state court convictions is without merit. Judge Parker laid this issue to rest almost 60 years ago when our court decided, in Myers v. United States, 49 F.2d 230 (4th Cir.1931), that the evidence that a defendant had pled guilty in state court to possession of liquor found on premises on the day following the alleged sale was properly admitted in a federal court prosecution for the sale. The trial court faced and decided this issue in its well reasoned opinion, United States v. Pryba, 680 F.Supp. 790 (E.D.Va.1988). We find its opinion persuasive and adopt it.
 
 
 60
 The individual defendants claim that they were prejudiced by the introduction of the records of the 15 state court convictions of the corporate defendant. A careful examination of the record reveals that the trial judge took meticulous care to instruct the jury that the prior convictions of Educational Books, Inc. could only be considered predicate acts as to the corporate defendant. On at least seven occasions the judge explained how these convictions could be used and there could be no doubt in the minds of the jurors on this point.
 
 
 61
 The individual defendants claim that there was a spillover effect as a result of the introduction of these prior convictions, but our review of the record does not confirm this. The jury was carefully instructed to consider the evidence separately as to each defendant and as to each count in the indictment. It is obvious that the jury followed these instructions. It acquitted defendant Williams on Count 1 and acquitted the Prybas on the tax counts.
 
 VIII
 
 62
 We find no merit to appellant Williams' claim that she should have been severed. Persons indicted together should be tried together, United States v. Brugman, 655 F.2d 540, 542 (4th Cir.1981), and the defendant must show that a joint trial would have been so prejudicial as to have resulted in a miscarriage of justice. Id. at 542-43. Williams did not make such a showing and it is obvious from the jury's verdict that the charges against her were considered individually: she was acquitted on a charge on which all other defendants were found guilty.
 
 IX
 
 63
 Appellants claim error in the jury instructions because the trial judge charged:
 
 
 64
 Contemporary community standards are set by what is, in fact, accepted in the adult community as a whole, and not by what the community merely tolerates and not by what by some groups or persons may believe the community ought to accept or refuse to accept. Obscenity is not a matter of individual taste, and the question is not how the material impresses an individual juror; rather, the test is whether the average adult person of the community would view the material as an appeal to the prurient interest in nudity, sex, or excretion.
 
 
 65
 Appellants claim the test for obscenity to be a community's toleration for sexually oriented material--what a community will put up with, permit or allow. They seek support of this standard in Smith v. United States, 431 U.S. 291, 305, 97 S.Ct. 1756, 1766, 52 L.Ed.2d 324 (1977):
 
 
 66
 Our decision that contemporary community standards must be applied by juries in accordance with their own understanding of the tolerance of the average person in their community does not mean, as has been suggested, that obscenity convictions will be virtually unreviewable.
 
 
 67
 This language is taken from the court's discussion of the test established in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), in which the court enunciated a test for obscene and hard core pornography materials. Under this test the jury must decide (a) whether the average person applying contemporary community standards would find that the work, taken as a whole, appealed to prurient interests; (b) whether the work depicts or describes in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. Miller involved a state statute, but the test has been found equally applicable to federal legislation. United States v. 12 200 Foot Reels of Film, 413 U.S. 123, 129-30, 93 S.Ct. 2665, 2670, 37 L.Ed.2d 500 (1973); United States v. Orito, 413 U.S. 139, 145, 93 S.Ct. 2674, 2679, 37 L.Ed.2d 513 (1973); and Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). Miller does not mention "acceptance" or "toleration" in discussing contemporary community standards.
 
 
 68
 To consider community toleration as synonymous with what a community will put up with skews the test of obscenity and invites one to consider deviations from community standards, because a community can be said to put up with a number of disagreeable circumstances that it cannot stop. The District of Columbia had over 350 murders in 1989, but to say that the citizens "tolerated" this epidemic of homicides would misuse the word. While the City of Washington may not be able to eradicate murder, it can stop the sale of obscenity by assuming the burden of prosecuting those engaged in this crime.
 
 
 69
 To take the word "tolerance" out of one sentence in Smith and insist that it be used as the test for contemporary community standards misreads the opinion. It is ironic that the word "toleration" should be taken from one part of the opinion, while the opinion clearly states that "the court instructed the jury that contemporary community standards were set by what is in fact accepted in the community as a whole." 431 U.S. at 297-98, 97 S.Ct. at 1762.
 
 
 70
 The use of tolerance as the correct test was rejected by the Fifth Circuit in Hoover v. Byrd, 801 F.2d 740 (5th Cir.1986), when the court stated:
 
 
 71
 Petitioner's insistence that "tolerance" must be substituted for "decency" affronts the notion of "standards," because tolerance embodies the permissible deviations from standards. As was shown above, the Miller definition of obscenity, taken as a whole, narrowly circumscribes the arena of state regulation to depictions or descriptions of sexual conduct which per se deviate from those of the community at large. Moreover, as Miller and Smith emphasize, obscenity is to be judged by community standards, which requires the jury to consider the average person rather than the most prudish or most tolerant. Smith, supra. To incorporate a requirement of "tolerance" within the definition of "community standards" not only turns the notion of standards upside down, but it also undermines the goal of Miller to permit differing levels of obscenity regulation in ... diverse communities.
 
 
 72
 801 F.2d at 741-42 (emphasis in original).
 
 
 73
 We find no error in the jury instructions for failing to charge on community toleration.
 
 X
 
 74
 Appellants claim error in the jury instructions relating to the RICO conspiracy count, and they argue that, to convict, the government must prove that a defendant personally agreed to commit two or more specified predicate crimes. On this point the district judge charged that, to convict a defendant of RICO conspiracy, the government must prove:
 
 
 75
 [T]hat each defendant agreed to personally commit or aid and abet two or more acts of racketeering in violation of Section 1962(a) or that each defendant agreed that another coconspirator would commit two or more acts of racketeering in violation of 1962(a).
 
 
 76
 Appellants argue that this language allows a conviction even if the jury failed to find that the defendant personally agreed to commit the two or more predicate acts; however, to adopt appellants' argument would require that RICO conspirators be involved in the affairs of a conspiracy to a greater extent than required in other conspiracies. The heart of a conspiracy is the agreement to do something that the law forbids. There is no requirement that each conspirator personally commit illegal acts in furtherance of the conspiracy or to accomplish its objectives. To adopt appellants' position would add an element to RICO conspiracy that Congress did not direct, and this would be contrary to the majority of circuits which have decided the issue. United States v. Rosenthal, 793 F.2d 1214, 1228 (11th Cir.1986) ("Finally, there is no requirement that each defendant must have agreed to commit two predicate acts of racketeering activity. United States v. Carter, 721 F.2d 1514, 1528-31 (11th Cir.1984). The government need only prove that each defendant conspired to commit the substantive RICO offense and was aware that others had done likewise."); United States v. Neapolitan, 791 F.2d 489, 498 (7th Cir.1986) ("Nothing on the face of the statute or its legislative history supports the imposition of a more stringent level of personal involvement in a conspiracy to violate RICO as opposed to violate anything else. In fact, it seems more likely that Congress, in search of means to prosecute the leaders of organized crime, intended Section 1962(d) to be broad enough to encompass those persons who, while intimately involved in the conspiracy, neither agreed to personally commit nor actually participated in the commission of the predicate crimes."); United States v. Joseph, 781 F.2d 549, 554 (6th Cir.1986) ("We reach a different conclusion with respect to the conspiracy count, 18 U.S.C. Sec. 1962(d). For a conspiracy conviction it is not necessary to prove that the defendant agreed to personally commit the requisite acts, but only that he agreed that another violate Sec. 1962(c) by committing two acts of racketeering activity."); United States v. Adams, 759 F.2d 1099, 1116 (3d Cir.1985) ("We now decide that to be convicted of a RICO conspiracy, a defendant must agree only to the commission of the predicate acts, and need not agree to commit personally those acts."); United States v. Tille, 729 F.2d 615, 619 (9th Cir.), cert. denied, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984) ("The statutory language, however, does not require proof that a defendant participated personally, or agreed to participate personally, in two predicate offenses. Read in context, section 1962(d) makes it unlawful to conspire to conduct or participate in the conduct of an enterprise's affairs, where its affairs are conducted through a pattern of racketeering activity."); see also United States v. Kragness, 830 F.2d 842, 859 (8th Cir.1987).
 
 
 77
 The First and Second Circuits have adopted appellants' view in United States v. Ruggiero, 726 F.2d 913 (2d Cir.), cert. denied, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984) and United States v. Winter, 663 F.2d 1120 (1st Cir.1981), cert. denied, 460 U.S. 1011, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983). The language in Winter relating to the agreement to commit the predicate acts personally was dictum. Ruggiero was the first case to decide this issue and its reasoning has not persuaded other circuits, and it does not persuade us. RICO conspiracy does not require that each coconspirator personally agree to commit two or more acts of racketeering in violation of Sec. 1962(a).
 
 XI
 
 78
 We find no merit to the claim of appellant Williams that the evidence was insufficient to sustain her convictions. She claims that she was just a front person and had no control over the businesses. However, the evidence was sufficient to establish the fact that she held all offices in the corporations, that she kept the books, that she was a long time employee, that she hired at least one employee and directed others in their work. There was ample evidence to support a finding that she was aware of the sexually explicit nature of the materials that the corporations were selling and she worked on a daily basis in the warehouse where these materials were stored. This was substantial evidence from which reasonable jurors could find her guilty as charged.
 
 
 79
 AFFIRMED.
 
 
 
 [1]
 The government sought to prove by circumstantial evidence that practically all of appellants' inventory was obscene. This request was denied, United States v. Pryba, 674 F.Supp. 1518 (E.D.Va.1987)