The STATE of Ohio, Appellee,

v.

MIDWEST PRIDE IV, INC., Appellant.

[Cite as *State v. Midwest Pride IV, Inc.* (1998), 131 Ohio App.3d 1.]

Court of Appeals of Ohio,
Twelfth District, Fayette County.

No. CA97–09–025.

Decided Dec. 28, 1998.

2

4

*Steven H. Eckstein,* Fayette County Prosecuting Attorney, for appellee.

*Berkman, Gordon, Murray & DeVan, J. Michael Murray, Brooke F. Kocab* and *Angela M. Greene,* for appellant.

WILLIAM W. YOUNG, Presiding Judge.

Defendant-appellant, Midwest Pride IV, Inc., d.b.a. The Lion's Den Adult Bookstore, appeals its convictions in the Fayette County Court of Common Pleas on two separate counts of pandering obscenity. Appellant raises five assign-

ments of error. For the reasons set forth herein, the trial court's decision is affirmed.

## FACTUAL BACKGROUND

On December 21, 1995, Randy Bliss, a Ross County Deputy Sheriff, entered The Lion's Den at the intersection of I–71 and S.R. 35 in Fayette County. Bliss selected one four-hour adult video entitled "Rammin' and Crammin' " for purchase. The video cover of "Rammin' and Crammin' " contains several photographs of various adult couples engaged in numerous sex acts.

On December 22, 1995, Jeff McCarty, an Adams County Deputy Sheriff, entered The Lion's Den and selected a half-hour adult video entitled "Guys Who Butt Ball Themselves" for purchase. The video consists of two vignettes involving men with eighteen-inch penises engaging in anal intercourse with themselves with the assistance of various nude women.

Appellant was indicted on two separate counts of pandering obscenity in violation of R.C. 2907.32(A)(5). Both indictments contained a specification that appellant had previously been convicted of pandering obscenity, and such prior convictions resulted in appellant's offenses being elevated to fourth-degree rather than fifth-degree felonies.[1] The trial for both cases commenced on August 13, 1997.

Jury selection spanned two full days. During jury selection, the trial court *sua sponte* dismissed a potential juror named Teresa Caulley. Caulley had previously served on a pandering-obscenity case in Fayette County that resulted in an acquittal of two of appellant's employees. Unfortunately, in the instant case, the trial court's audio tape-recording system malfunctioned during the portion of voir dire addressing Caulley's dismissal. Consequently, no transcript exists of the exchange between counsel, the trial judge, and Caulley.

The trial proceeded and the prosecution presented testimony from Deputies Bliss and McCarty. Both videos purchased at The Lion's Den were played for the jury in full and placed into evidence. Appellant then attempted to introduce into evidence the results of a public opinion poll survey of Fayette County residents, and the expert testimony of Dr. Joseph Scott, a sociologist and criminologist with a background in statistical methodology who had conducted the survey. Scott's survey was specifically designed to ascertain community standards regarding sexually explicit materials.

---

1. R.C. 2907.32(C) provides:

"Whoever violates this section is guilty of pandering obscenity, a felony of the fifth degree. If the offender previously has been convicted of a violation of this section or of section 2907.31 of the Revised Code, then pandering obscenity is a felony of the fourth degree."

The survey's first seventeen questions identified innocuous information, including the interviewee's age, gender, county of residence, voting status, political affiliation, religious practices, annual income, reading habits and movie viewing frequency. Following these introductory questions, interviewers were directed to read the following statement to interviewees:

"The next few questions deal with adult x-rated videos and sexually explicit magazines. These videos and magazines may have little or no plot. Their contents are primarily graphic depictions of nudity and sex, showing a variety of actual sexual activities including: vaginal intercourse, ejaculations, bondage, oral sex, masturbation, anal sex, use of vibrators, lesbian sex, group sex and variations of these by adult performers, no minors are involved, and these materials can only be purchased, rented, or viewed by adults who desire them."

Each interviewee was then asked the following questions:

"17. Do you think standards have changed in Fayette County so that the rental or sale, of video cassettes and magazines depicting such nudity and sex, to adults, is *more* or *less* acceptable today than in recent years?

"18. Do you *agree* or *disagree* that the portrayal of sexual conduct in X-rated videos and sexually explicit magazines, as described, is acceptable in Fayette County for those adults who may want to purchase and view them?

"19. Is it *acceptable* or *not acceptable* in Fayette County, for such videos and magazines to be sold or rented to adults who request such material?

"20. Do you believe that you, as an adult, should be allowed to purchase and view videos and magazines depicting such sexual conduct if you should want to do so?

"21. Would your viewing of adult videos and magazines depicting actual sex acts in great detail and with close-ups of the sexual organs, as described, appeal to any shameful, morbid, or unhealthy interest in sex that you might have?

"22. Would the viewing of adult videos and magazines depicting actual sex acts in great detail and with close-ups of the sexual organs, as described, appeal to any shameful, morbid, or unhealthy interest in sex that the average adult in Fayette County might have?" (Emphasis *sic.*)

At trial, the prosecution objected to the introduction of the public opinion poll survey, its results, and Scott's expert opinions. The prosecution contended that such evidence was neither relevant nor probative, and that the survey only touched on "nudity and sex" as broadly defined. The prosecutor further argued that since the videos "Rammin' and Crammin'" and "Guys Who Butt Ball Themselves" were in fact admitted into evidence, they were the best evidence

available and the admission of the public opinion poll and its results was not necessary.

The trial court excluded appellant's expert testimony and the opinion poll results, stating:

"Well, I'm familiar with this survey of the doctor has conducted [sic]. It's a telephone survey and I've reviewed it and heard his testimony in a prior matter, and as I indicated before, I don't believe that telephone or public opinion polls are correct ways to determine what is obscene material. * * * I agree * * * that the results of public opinion polls are irrelevant."

For the record and outside the presence of the jurors, appellant proffered Scott's methodology and his expert opinion that the materials, as described by the survey, fell within the community standards of Fayette County residents.

At the conclusion of the case, the trial court issued several instructions to the jury. Appellant, citing State v. Keaton (1996), 113 Ohio App.3d 696, 681 N.E.2d 1375, requested that the jury be instructed about the state's burden of proof as follows:

"X. The state bears the burden of proving all three elements of obscenity to the satisfaction of the jury beyond a reasonable doubt. It is not required to introduce evidence of community standards. * * *

"XI. Should the [state] fail to introduce evidence of community standards * * *, [you as] the trier of fact may choose to find that the state has failed to sustain its burden of proof.

"XII. [You as the] jury [are] free to acquit [the defendant if you are] unable to determine community standards."

The trial court refused to give the jury appellant's proposed instructions and opted instead to read the burden-of-proof instructions taken directly from Ohio Jury Instructions. Specifically, the jury was charged as follows:

"In order for the material to be obscene, all three elements of this test must be proven beyond a reasonable doubt: (1) Whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to prurient interest. (2) Whether to the average person applying contemporary community standards, the work depicts or describes in a patently offensive way, sexual conduct as defined in these instructions. (3) Whether the work taken as a whole, lacks serious literary, artistic, political or scientific value."

At the close of the jury charge the court reiterated:

"If you find that the state proved beyond a reasonable doubt all of the essential elements of any one or both of the offenses charged in the indictments, your verdict must be guilty as to such offense or offenses according to your findings.

*If you find that the state failed to prove beyond a reasonable doubt any one of the essential elements of one or both of the offenses charged in the indictments, your verdict must be not guilty* as to such offense or offenses according to your findings." (Emphasis added.)

Following deliberations, on August 20, 1997, the jury unanimously convicted appellant on both counts of pandering obscenity. The trial court then sentenced appellant to the maximum in fines totaling $20,000. Appellant filed its notice of appeal on September 17, 1997.

Upon discovering that no transcript existed of the trial court's *sua sponte* dismissal of Caulley as a potential juror, pursuant to App.R. 9, appellant filed two motions to supplement the record; one on February 27, 1998, with the trial court, and one on March 9, 1998, with this court. Appellant's proposed supplement to the record consisted of a total of seven paragraphs, all of which were submitted to the prosecutor for approval. An affidavit filed with the trial court from appellant's counsel indicated that the prosecutor took issue with proposed paragraph five, and consequently refused to sign the stipulation.

On March 19, 1998, the trial court filed its judgment entry. The entry consisted of seven paragraphs. The only discrepancies between appellant's proposed stipulated paragraphs and the trial court's entry appear in paragraphs five and six. Appellant's proposed supplemental paragraphs five and six read as follows:

"5. Potential juror Teresa Caulley was called to the jury box for questioning. During questioning by counsel. Ms. Caulley indicated that she had been a juror in a prior pandering obscenity case involving two young women. She volunteered that she would prefer not to serve again as a juror in the same kind of case, but said that if required to serve she could be fair and impartial. At that time, the judge, without request from any counsel, *sua sponte* excused the juror.

"6. Prior to the juror leaving the courtroom, defense counsel approached the bench and objected to the judge's *sua sponte* dismissal of the juror, and asked the court to reverse itself and re-seat her. Counsel pointed out that the jury trial referred to by potential juror Caulley was *State v. Walp and Alcorn,* pandering obscenity cases based on videotapes similar to those at issue in this trial which involved employees of Midwest Pride IV, Inc., the current defendant, who were acquitted by the jury. Counsel then argued based on the questions asked of Ms. Caulley and the answers she gave, that since there was no real reason to excuse Ms. Caulley under the rules, the real reason for the judges' [*sic*] decision to *sua sponte* dismiss her was because she was on a jury that acquitted the defendant's employees of pandering obscenity."

However, the supplemental paragraphs adopted by the trial court pursuant to App.R. 9(E) read as follows:

"5. Potential juror Teresa Caulley was called to the jury box for questioning by counsel. Ms. Caulley indicated she had been a juror in a prior pandering obscenity case involving two young women. She volunteered that she would prefer not to serve again as a juror in the same kind of case. At that time, the trial court excused the juror.

"6. After the juror had left the courtroom, and another juror had been seated for questioning, defense counsel approached the bench and objected to the judge's dismissal of the juror, and asked the court to reverse itself and re-seat her. Counsel contended that the jury trial referred to by potential juror Caulley was *State v. Walp* and *State v. Alcorn*, which involved employees of Midwest Pride IV, Inc., who were acquitted by the jury, and that the judge's dismissal of juror Caulley was because of this acquittal in the prior case."

THE ASSIGNMENTS OF ERROR

In its first assignment of error, appellant contends:

■ "The trial court erred in refusing to permit the appellant to present expert testimony and a random sample survey and its results into evidence where the evidence was relevant to the contemporary community standards element of the *Miller* test for obscenity, and as a result, the appellant was prevented from presenting a defense in violation of the First, Sixth, and Fourteenth Amendments to the United States Constitution."

■ Central to an understanding of appellant's assignment of error is a determination of whether the videos purchased at The Lion's Den are legally obscene. The constitutional test for obscenity was announced by the Supreme Court in *Miller v. California* (1973), 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419. A video in the instant case may be deemed obscene, thereby losing its First Amendment protection, if a factfinder concludes that:

(1) the average person applying contemporary community standards, would find that the video, taken as a whole, appeals to the prurient interest;

(2) the video depicts, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and

(3) the video taken as a whole lacks serious literary, artistic, political, or scientific value. *Id.* at 24, 93 S.Ct. at 2615, 37 L.Ed.2d at 431.

■ We begin with the premise that if the materials themselves are placed into evidence, they "are the best evidence of what they represent." *Paris Adult Theatre I v. Slaton* (1973), 413 U.S. 49, 56, 93 S.Ct. 2628, 2634, 37 L.Ed.2d 446,

456. Accordingly, the Supreme Court has held that "there is no constitutional need for expert testimony * * * once the challenged materials are placed into evidence." *United States v. Pryba* (E.D.Va.1988), 678 F.Supp. 1225, 1231. In fact, in an obscenity case, expert testimony is not *required* in order to determine whether certain materials are obscene, unless the materials are "directed at such a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the material appeals to the prurient interest." *Urbana ex rel. Newlin v. Downing* (1989), 43 Ohio St.3d 109, 113, 539 N.E.2d 140, 145; citing *Paris Adult Theatre I*, 413 U.S. at 56, 93 S.Ct. at 2634–2635, 37 L.Ed.2d at 456, fn. 6.

However, the foregoing case law does not mean that expert testimony concerning the *Miller* test is *per se* inadmissible. On the contrary, the United States Supreme Court has held that "the defendant can introduce competent, relevant, and appropriate expert testimony." *Pryba* at 1231, citing *Kaplan v. California* (1973), 413 U.S. 115, 121, 93 S.Ct. 2680, 2685, 37 L.Ed.2d 492, 498–499. In fact, while affirming the exclusion of certain evidence in an obscenity case prior to the instant case, we stated that "[t]he trial court rulings did not deprive appellants of their right to introduce other evidence, *including expert and lay testimony, concerning the obscenity test.*" (Emphasis added.) *State v. Keaton*, 113 Ohio App.3d at 702, 681 N.E.2d at 1379. Such language suggests that in certain situations, this court would consider the admission of certain expert testimony concerning the *Miller* test both relevant and proper. The instant case, however, is not one of those situations.

A number of cases have addressed the relevance and admissibility of opinion poll evidence and expert opinions within the *Miller* obscenity-test context, including the case upon which the trial court in the instant case relied, *Pryba*, 678 F.Supp. 1225. In *Pryba*, the court was faced with the admission of public opinion poll evidence conducted by Scott, which allegedly addressed the community-standard prong of the *Miller* obscenity test. The court in *Pryba* held that the results of the public opinion poll were irrelevant because the "pollster's questions were not designed to elicit information about whether there was community acceptance *of the actual materials in question* or similar materials." (Emphasis added.) *Id.* at 1228. Rather, the court reasoned, the survey focused on the general opinions, attitudes and acceptance of "the viewing of 'nudity and sex,' defined broadly." *Id.* at 1229. The court also noted that often, "language, however rich for some purposes, is simply unequal to the task of conveying to a reader what the visual images convey to the viewer. There is, no doubt, a large difference in communicative impact and effect between the written phrase 'homosexual fellatio and anal intercourse' and the vivid depiction of it on video." *Id.* at 1227, fn. 3.

The district court in *Pryba* reasoned that "[e]ven if the poll's results were marginally relevant, the probative value of this evidence was substantially outweighed by the danger that it would have been unfairly prejudicial * * *, would have confused the issues, and would have misled the jury." *Id.* at 1231.

Three years after *Pryba*, the Tenth District Court of Appeals was faced with determining the admissibility of similar testimony from Scott and the results of a public opinion poll he conducted allegedly addressing the community standards in Franklin County, Ohio. In *State v. Williams* (1991), 75 Ohio App.3d 102, 598 N.E.2d 1250, the Tenth District Court of Appeals articulated the following two-pronged test to determine whether public opinion poll evidence addressing the community-standard prong of the *Miller* obscenity test was relevant:

"[A] properly conducted opinion poll may be relevant to a determination of whether the particular film in question is obscene. *On the issue of relevance, the poll must be relevant to a determination of community standards in general and the community's acceptance of viewing the particular film in question.*" (Emphasis added.) *Id.* at 113, 598 N.E.2d at 1257.

■ Thus, pursuant to *Williams*, in order to determine whether public opinion poll evidence is relevant, a reviewing court must ask (1) does the survey address community standards in general, and (2) does the survey address the community's acceptance of the *particular* work in question? While the Tenth District Court of Appeals remanded the matter to the trial court in order for it to make a determination of relevancy, the court was careful to state that whatever the outcome, "the trial court nevertheless has wide discretion in determining admissibility." *Id.* at 114, 598 N.E.2d at 1258, citing *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343.

Three weeks later, the Tenth District Court of Appeals again addressed the issue of the admissibility of public opinion poll evidence and related testimony. In *State v. Caudill* (1991), 75 Ohio App.3d 322, 599 N.E.2d 395, the appellant sought to have a public opinion poll conducted by Scott admitted into evidence. The court of appeals reiterated the fact that "the predominant view is that the admission of expert testimony regarding community standards is not required, but within the discretion of the trial court." *Id.* at 328, 599 N.E.2d at 399. Then, while affirming the trial court's exclusion of the opinion poll survey and related evidence, the court stated:

"The survey proffered here was a random telephone survey of approximately five hundred people and explored whether Franklin County residents were, in general, offended by sexually explicit materials. *It did not specifically reference the video tape in question, nor did the survey describe the material alleged to be*

*obscene or ask questions based upon the specific acts shown in the videotape.*"
(Emphasis added.) *Id.* at 329–330, 599 N.E.2d at 400.

Thus, the court found that the public opinion poll evidence did not meet the
two-pronged relevancy test set out in *Williams*, 75 Ohio App.3d 102, 598 N.E.2d
1250, and affirmed the trial court's exclusion of such evidence.

In the instant case, we find that the trial court ultimately arrived at the right
result when it denied admission of the public opinion poll results and expert
testimony. However, the trial court arrived at that result for the wrong reason.
The trial court stated that it did not "believe that telephone or public opinion
polls [were] correct ways to determine what is obscene material." Such reason-
ing is clearly contrary to the weight of authority that has held that "a properly
conducted opinion poll may be relevant to a determination of whether a particular
film in question is obscene." *Williams*, 75 Ohio App.3d at 113, 598 N.E.2d at
1257. Nevertheless, we find that the trial court's exclusion of survey evidence
and expert opinions should be affirmed on other grounds.

The survey's questions do not satisfy the two-pronged test of relevancy
articulated by the court of appeals in *Williams*. Upon careful review of the
public opinion poll's six community-standard questions, we find that only three of
the questions even arguably address Fayette County's contemporary community
standards regarding sexually explicit materials.[2] The remaining three questions
are not relevant to ascertaining Fayette County's contemporary community
standards regarding sexually explicit materials. Question seventeen asks wheth-
er the interviewee thinks that standards in Fayette County have changed in
recent years, but fails to address what the actual Fayette County standard is or
was. Question twenty is designed to ascertain the particular interviewee's
general belief as to whether adult videos and/or magazines should enjoy constitu-
tional protection. Such a question is immaterial in ascertaining Fayette County's
contemporary community standards regarding sexually explicit materials. Final-
ly, question twenty-one is designed to ascertain whether adult videos and/or
magazines appeal to the particular interviewee's own personal prurient interest,
rather than addressing whether such materials fall within Fayette County
community standards.

While we do find that some of the survey questions arguably address Fayette
County community standards in general, upon review we find that no question in
the public opinion poll addresses the second prong of the *Williams* test. That is
to say, no question specifically refers to the videotapes in question. Not a single

---

2. We find that questions eighteen, nineteen, and twenty-two arguably are designed to ascer-
 tain the contemporary community standard of the average Fayette County adult within the
 obscenity context.

question in the survey describes the material alleged to be obscene or addresses any of the specific acts shown in the videotapes. We find that such questions are not only relevant but crucial in order to ascertain the community's acceptance of a video and to avoid misleading an interviewee. While the terms "masturbation" and "anal sex" were, in fact, read to each interviewee before the public opinion poll's community-standard questions were asked, we note, for example, that had the interviewees been given a description of the visual image of a man with a grossly enlarged penis engaged in anal intercourse with himself, they may have given very different survey responses. Accordingly, because the public opinion poll conducted by Scott did not inquire into whether any of the explicit sexual acts depicted on the videos in question fell within the contemporary community standards of Fayette County, the evidence failed to satisfy the second prong of the *Williams* test. We find that the public opinion poll, its results, and Scott's expert opinions would have been, at best, of tenuous probative value.

The admission of survey evidence lies directly within the "wide discretion" of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343. Any probative value the survey evidence may have had in this case was substantially outweighed by the danger that it would have been unfairly prejudicial, would have confused the issues, and could have potentially misled the jury. We therefore find that Scott's public opinion poll evidence was of marginal probative value and was in fact potentially prejudicial, misleading and confusing to the jurors. It was therefore properly excluded, and appellant's first assignment of error is overruled.

In its second assignment of error, appellant contends:

"The trial court erred by refusing to give pertinent, correct jury instructions on community standards as requested by the defense in writing on a timely basis."

Appellant's second assignment of error requires an analysis of this court's decision in *State v. Keaton*, 113 Ohio App.3d 696, 681 N.E.2d 1375. In *Keaton*, the appellant requested that the jurors be instructed that if they could not determine community standards with respect to the explicit sexual materials in question, they *must* acquit the appellant. Analyzing the instruction, this court held that an instruction compelling or mandating the jurors to acquit appellant under such circumstances was an incorrect statement of law. In the instant case, rather than request an instruction that if jurors were unable to determine contemporary community standards they were *compelled* or *mandated* to acquit appellant, appellant requested that the jurors be given an instruction that if jurors were unable to determine contemporary community standards they *could* acquit. Appellant further contends that because the requested instruction was

both a pertinent and correct statement of law, the trial court erred in refusing to provide it to the jurors.

When reviewing a trial court's jury instructions, an appellate court must limit its review to whether the trial court's refusal to give a requested jury instruction constitutes an abuse of discretion under the facts and circumstances of the case. *State v. Wolons* (1989), 44 Ohio St.3d 64, 68, 541 N.E.2d 443, 446–447; *Prejean v. Euclid Bd. of Edn.* (1997), 119 Ohio App.3d 793, 804–805, 696 N.E.2d 606. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482–483, 450 N.E.2d 1140, 1141–1142.

Ohio case law provides that a party's requested jury instructions "should ordinarily be given if they are correct statements of law applicable to the facts in the case and reasonable minds might reach the conclusion sought by the specific instruction." *Prejean* at 804, 696 N.E.2d at 613, citing *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828, 832. Additionally, while "it is not mandatory upon a trial court to give requested instructions to the jury verbatim * * * if the requested instructions contain a correct, pertinent statement of the law and are appropriate to the facts they must be included, *at least in substance*, in the court's charge to the jury." (Emphasis added.) *State v. Nelson* (1973), 36 Ohio St.2d 79, 65 O.O.2d 222, 303 N.E.2d 865, paragraph one of the syllabus. Nevertheless, because a trial court "retains discretion to use its own language to communicate * * * legal principles," Ohio courts have held that a "trial court need not give a proposed instruction in the precise language requested by its proponent, even if it properly states an applicable rule of law." *Youssef v. Parr* (1990), 69 Ohio App.3d 679, 690, 591 N.E.2d 762, 769.

Upon review of the applicable law and the actual instructions given to the jurors in the instant case, we find that the trial court did not abuse its discretion by instructing the jury as it did. The trial court's instructions adequately advised the jury of the applicable burden of proof, namely, that the state had the burden of proving all three elements of the obscenity test beyond a reasonable doubt, and that if the jurors found that "the state failed to prove beyond a reasonable doubt any one of the essential elements," then a not guilty verdict was warranted. Appellant's proposed instructions would have simply instructed the jury on these same legal principles using different language. In light of the instructions given, appellant's proposed instructions would have been repetitive and might have actually confused the jurors.

Accordingly, because the trial court's instructions were correct and pertinent statements of the law, appropriate to the facts of the instant case, and communicated to the jurors, at least in substance, the same legal principles as appellant's requested instructions, we find that the trial court did not abuse its discretion by refusing to instruct the jury as requested by appellant. The second assignment of error is therefore overruled.

In its third assignment of error, appellant contends:

 "The trial court erred in failing to provide the appellant with a complete and accurate record of the proceedings."

Appellant argues that the supplemental record certified by the trial court mischaracterizes several factual events with respect to potential juror Caulley's dismissal. Specifically, appellant asserts that the fact that Caulley stated that she could be fair and impartial if she was required to serve was omitted from the trial court's entry. Furthermore, appellant objects to the trial court's determination of Caulley's physical location at the time appellant lodged its objection to her dismissal.

We find that the trial court was correct in determining that App.R. 9(E) governs the supplementation of the record under the circumstances of the instant case. App.R. 9(E) provides:

"Correction or modification of the record. If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by the court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the trial court, * * * may direct that omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted."

The instant case presented a situation in which neither the parties nor the trial court could agree upon how the events surrounding Caulley's dismissal occurred. After being presented with appellant's proposed stipulation, the prosecutor advised appellant's counsel that he could not sign it, and the trial court obviously disagreed with appellant.

 When a conflict over the facts to be included in a supplement to the record arises, the Supreme Court of Ohio has held that "[s]uch conflict is for the trial court to resolve in its sound discretion." *State v. Schiebel* (1990), 55 Ohio St.3d 71, 82, 564 N.E.2d 54, 67. "Where a trial court receives and evaluates conflicting evidence regarding the state of the record, the decision to correct or supplement the record pursuant to App.R. 9(E), rests upon the court's ability to weigh the evidence. Where it is supported by competent, reliable evidence, such

a ruling will not be reversed by a reviewing court absent an abuse of discretion." *Id.*

In the case at bar, the trial court stated that it relied "upon its own recollection of the matter as refreshed by the filings of the parties and reference to the record" to construct a certified record of the proceedings. App.R. 9 "gives the trial judge the responsibility, duty, and authority to delete, add, or otherwise modify portions of a proposed statement so that it will conform to the truth and be accurate before he approves it." *Joiner v. Cleveland Illum. Co.* (1978), 55 Ohio App.2d 187, 196, 9 O.O.3d 340, 345, 380 N.E.2d 361, 366.

"Naturally, in most instances when both parties who have competing and vested interests in the outcome of a case agree as to the accuracy of a statement of evidence or proceedings, it is unlikely that the trial judge would make any additions, deletions, or modifications and in all probability would approve it as submitted to him. *However, Appellate Rule 9 does grant the trial court the responsibility and authority to make any such deletions, additions or modifications to a proposed narrative statement of evidence or proceedings.*" (Emphasis added.) *Id.*

A comparison of appellant's proposed stipulation and the trial court's entry reveals that the trial court adopted, in large part, appellant's proposed paragraphs. The only differences between the two are factual in nature, and we find that they are immaterial to the ultimate disposition of this case. The fact that the trial court omitted Caulley's alleged statement about her ability to remain fair and impartial, in light of her admitted prior jury service on a case involving (1) two employees of appellant, (2) the same criminal charge as is at issue in this case, and (3) similar explicit sexual materials does not warrant a reversal of this matter. Additionally, we find that the dispute over Caulley's whereabouts at the time of appellant's objection is completely immaterial to this case's disposition.

Because the trial court found appellant's proposed stipulation unsatisfactory, it drafted its own statement of facts and evidence, which has become the certified record of the proceedings. Well-established legal authority certainly grants the trial court this prerogative and discretion. *Joiner,* 55 Ohio App.2d at 196, 9 O.O.3d at 345, 380 N.E.2d at 366–367. Thus, pursuant to App.R. 9(E), we must presume that the trial court's entry detailing the record of proceedings conforms to the truth. Accordingly, we hold that the entry filed by the trial court is the exclusive factual record of the proceedings before us for the purposes of appeal. See App.R. 12(A) and *State v. Dickard* (1983), 10 Ohio App.3d 293, 295, 10 OBR 467, 469–470, 462 N.E.2d 180, 182–183. Appellant's third assignment of error is overruled.

In its fourth assignment of error, appellant contends:

"The trial court erred in *sua sponte* dismissing a qualified prospective juror in violation of the appellant's Sixth And Fourteenth Amendment rights under the United States Constitution and Article I, Section 10 of the Ohio Constitution."

The United States Constitution and Section 10 Article I of the Ohio Constitution guarantee the accused in a criminal case a fair and impartial jury. In this assignment of error, appellant contends that, in the absence of any indication that Caulley could not be fair and impartial, the trial court erred in *sua sponte* dismissing her. We disagree.

A potential juror may be dismissed from service by one of two methods. A juror may be removed from service when a party exercises a peremptory challenge, or a juror may be removed from service when a party challenges for cause. Typically, *a party* requests that a member of the jury be dismissed from service as a juror because of a specific reason. In Ohio, such reasons are controlled by statute. See R.C. 2313.42 and 2945.25. However, in the instant case, the dismissal of juror Caulley was a result of *the trial court's* request, rather than the request of a party.

Neither appellant nor appellee has provided this court with any legal authority directly addressing this particular circumstance. Indeed, this court's own research has failed to uncover any precedent directly prohibiting a trial court from *sua sponte* challenging or dismissing jurors for cause. Consequently, we turn to the relevant provisions of the Revised Code and the Criminal Rules for guidance.

R.C. 2313.42 provides:

"The following are good causes to challenge any person called as a juror:

"* * *

"(J) That he discloses by his answers that he cannot be a fair and impartial juror * * *."

R.C. 2945.25 in turn provides:

"A person called as a juror in a criminal case may be challenged for the following causes:

"* * *

"(B) That he is possessed of a state of mind evincing enmity or bias toward the defendant or the state;

"* * *

"(O) *That he is otherwise unsuitable for any other cause* to serve as a juror." (Emphasis added.)

Crim.R. 24, which closely resembles R.C. 2945.25,[3] further addresses the examination and challenging of jurors in a criminal case. Crim.R. 24 provides:

"(A) Examination of jurors. Any person called as a juror for the trial of any cause shall be examined under oath or upon affirmation as to his qualifications. *The court * .* * may itself conduct the examination. * * **

"(B) Challenge for Cause. A person called as a juror may be challenged for the following causes:

"* * *

"(9) That he is possessed of a state of mind evincing enmity or bias toward the defendant or the state;

"* * *

"(14) *That he is otherwise unsuitable for any other cause* to serve as a juror." (Emphasis added.)

██ Accordingly, this court finds that implicit in Crim.R. 24 is a trial court's authority to *sua sponte* dismiss a juror when it determines that a juror is not impartial or otherwise unsuitable for service.

██ In addition to the foregoing authority bestowed upon the trial court, Ohio case law provides that "[a] trial court enjoys broad discretion in determining a juror's ability to be impartial." *State v. Dennis* (1997), 79 Ohio St.3d 421, 427, 683 N.E.2d 1096, 1103, citing *State v. Williams* (1983), 6 Ohio St.3d 281, 288, 6 OBR 345, 351, 452 N.E.2d 1323, 1331–1332. In fact, the Ohio Supreme Court has expressly stated that "the decision to disqualify a juror * * * is a discretionary function *of the trial court.*" (Emphasis added.) *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 168, 559 N.E.2d 1301, 1308. "Where a trial court is vested with such authority, reversal on appeal is justified only if its exercise thereof constitutes an abuse of discretion," *id.* at 169, 559 N.E.2d at 1308, citing *Martin v. Martin* (1985), 18 Ohio St.3d 292, 294–295, 18 OBR 342, 343–345, 480 N.E.2d 1112, 1113–1115, and a trial court's ruling with respect to a potential juror "will not be disturbed on appeal unless it is manifestly arbitrary." *State v. Tyler* (1990), 50 Ohio St.3d 24, 31, 553 N.E.2d 576, 587. Further, a trial court has the inherent power to do all things that are "necessary to the preservation of judicial powers and processes." *State v. Lorain* (1968), 13 Ohio St.2d 133, 137, 42 O.O.2d 362, 364, 235 N.E.2d 232, 235, citing *State v. Townley* (1902), 67 Ohio St. 21, 26–27, 65 N.E. 149, 149–150.

---

**3.** Prior to the adoption of Ohio's Criminal Rules in 1974, the applicable provisions of the Revised Code controlled criminal procedure in this state. However, we note that now the Criminal Rules supersede their analogous Revised Code sections. *State v. Oliver* (Sept. 19, 1994), Preble App. No. CA94–03–003, unreported, 1994 WL 506211.

When reviewing a trial court's decision to retain or dismiss a juror, "an appellate court is not free to substitute its judgment for that of the trial judge." *Berk*, 53 Ohio St.3d at 169, 559 N.E.2d at 1308. This court has previously stated that such deference is proper because it is only the trial court that "has the opportunity to observe the demeanor of the prospective juror and evaluate firsthand the sincerity of the juror's responses to questions." *State v. Goff* (Apr. 21, 1997), Clinton App. No. CA95–09–026, unreported, 1997 WL 194898, citing *Berk* at 169, 559 N.E.2d at 1308–1309. A trial court's decision regarding a potential juror's suitability for service shall be "based upon determinations of demeanor and credibility that are peculiarly within a trial court's province." *Wainwright v. Witt* (1985), 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841, 852–853. Thus, pursuant to the applicable provisions of the Revised Code, Crim.R. 24, and the foregoing case law, we hold that a trial court may, in the exercise of its discretion, *sua sponte* dismiss a juror when it determines that a juror possesses either enmity or bias toward a party or determines that for some other reason a juror is not impartial or is otherwise unsuitable for service.

Turning our attention to the entry filed by the trial court, which we have determined to be the exclusive factual record of Caulley's dismissal, we find that the trial court did not err when it *sua sponte* dismissed her from service. Juror Caulley admitted during questioning by counsel that she had served as a juror in a prior case (1) involving the exactly the same charge that is at issue in the instant case—pandering obscenity, (2) involving two employees of exactly the same defendant involved in the instant case—Midwest Pride IV, Inc., and (3) involving explicit sexual material similar in nature to those at issue in the instant case. It is reasonable to assume that in her prior jury service, Caulley amassed specific knowledge or information about appellant and its business and business practices that other potential jurors had not. Upon review of these facts, we find that the trial court could have reasonably determined that allowing Caulley to serve as a juror would have given rise to, at the very minimum, an appearance of bias or partiality.

Even if this court were to accept appellant's contention that Caulley expressly stated that she could remain fair and impartial if selected for jury service, our research reveals that the trial court would be free, in the exercise of its discretion, to determine that Caulley would be unable to faithfully and impartially serve as a juror, and to dismiss her from service in spite of her comments to the contrary. Because an appellate court does not enjoy the luxury of being able to see and evaluate firsthand the demeanor and sincerity of a juror we respectfully defer to the trial court's determination of this issue. "A person called as a juror in a criminal case who clearly shows himself, on his voir dire, not to be impartial between the parties, is not rendered competent by saying that he believes himself able to render an impartial verdict." *Palmer v. State* (1885), 42

Ohio St. 596, 1885 WL 55, paragraph three of the syllabus. Accordingly, we find that the trial court's *sua sponte* dismissal of Caulley was neither unreasonable nor manifestly arbitrary. Appellant's fourth assignment of error is overruled.

In its fifth assignment of error, appellant contends:

"The trial court erred in not dismissing the indictment or at the least in failing to strike the prior conviction allegation from the indictment because of its failure to comply with O.R.C. 2941.11, and because the prior conviction was on appeal and therefore was not final at the time the charged offenses occurred."

Appellant's attack on the indictment is twofold. First, appellant contends that because the indictment failed to conform to R.C. 2941.11, it was fatally defective. R.C. 2941.11 mandates that when an indictment alleges a prior conviction it should "allege that the accused was, at a certain stated time, in a certain stated court, convicted of a certain stated offense, giving the name of the offense, or stating the substantial elements thereof."

Appellant first contends that because the instant indictment simply provided that "the Defendant [has] been previously convicted of pandering obscenity," and fails to specify the exact nature of the prior offense, the date of the prior convictions, and the court in which appellant was convicted, the trial court should have dismissed the indictment or struck the prior conviction language. Second, appellant contends that because at the time the instant indictment was filed, the prior convictions were pending on appeal and had not yet been affirmed, they were not "final" and should not have been used to elevate the offenses in the instant case to fourth degree felonies. Upon review, we find both of appellant's contentions to be without merit.

Crim.R. 7(B) provides:

"The indictment shall * * * be made in ordinary and concise language without technical averments or allegations not essential to be proved. The statement may be * * * in words sufficient to give the defendant notice of all of the elements of the offense with which the defendant is charged."

This court has previously addressed appellant's first contention under this assignment of error. Following the lead of other appellate courts, we have stated that Crim.R. 7(B) effectively supersedes R.C. 2941.11. *State v. Oliver* (Sept. 19, 1994), Preble App. No. CA94–03–003, unreported, at 2, 1994 WL 506211. "In order to comply with the requirements of Crim.R. 7(B), an indictment charging the defendant with [an elevated charge] need only give fair and adequate notice that the state will seek to prove that the accused has previously been convicted." *State v. Larsen* (1993), 89 Ohio App.3d 371, 379, 624 N.E.2d 766, 771. Thus, "[w]here an indictment complies with Crim.R. 7(B) and gives the accused adequate notice that the state will seek to prove the accused previously had been convicted of prior * * * offenses, the indictment does not need to allege that the

accused was, at a certain stated time, in a certain stated court, convicted of a certain stated offense." *Larsen* at 379, 624 N.E.2d at 771.

Accordingly, we find that the trial court did not err when it refused to dismiss the indictment or strike the prior conviction language from the indictment because it did not comply with the strict mandate of R.C. 2941.11. It is sufficient that the instant indictment complied with the requirements of Crim.R. 7(B).

■ We now turn to appellant's contention that because the prior convictions referred to in the instant indictment were on appeal and had not yet been affirmed, they were not "final" and therefore should not have been used to elevate the instant offenses into fourth-degree felonies. In support of its contention, appellant cites *Staniforth v. State* (1927), 24 Ohio App. 208, 156 N.E. 924. In *Staniforth,* the Cuyahoga Court of Appeals held that if a prior offense is appealed and its final determination results in "vitiating the proceedings and the sentence," then the accused may not be convicted of a second elevated offense. *Id.* at 209, 156 N.E. at 924. More recently, the Eighth District Court of Appeals held that where an accused's prior conviction for a criminal offense was found to be defective on appeal, no basis for his subsequent convictions on penalty enhanced offenses existed. See *State v. Gibson* (1986), 34 Ohio App.3d 146, 147, 517 N.E.2d 990, 991–992. We note however, that in *Gibson,* rather than reverse the entire case, the court of appeals simply affirmed the accused's subsequent convictions without the enhanced-penalty specifications. We further note that neither *Staniforth* nor *Gibson* are more than persuasive authority for this court.

We begin our analysis by examining what proof of "prior conviction" the prosecution is required to put forth at the time an indictment is filed. R.C. 2945.75(B) specifically directs our attention to the manner in which a prior conviction may be proved. See, also, *State v. Henderson* (1979), 58 Ohio St.2d 171, 177, 12 O.O.3d 177, 180, 389 N.E.2d 494, 497. R.C. 2945.75(B) provides:

"Whenever in any case it is necessary to prove a prior conviction, a certified copy of the entry of judgment in such prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar, is sufficient to prove such prior conviction."

■ Our research reveals that nothing more is required. Furthermore, a judgment of conviction exists at the moment that sentence is imposed by the trial court. *State v. Carter* (1992), 64 Ohio St.3d 218, 222, 594 N.E.2d 595, 598–599.

■ Accordingly, in the instant case, we find that at the time the indictment was filed, the trial court was not required to either dismiss the indictment or to strike the prior-conviction language. However, even if this court were to assume that the trial court committed error in refusing to dismiss the indictment or to strike the prior-conviction language, upon review of the facts of this case, we find the error to be harmless beyond a reasonable doubt. Crim.R. 52(A).

The prior convictions used by the prosecution in the instant case to elevate these offenses to fourth-degree felonies were appellant's prior convictions in *State v. Keaton*. These prior convictions were immediately appealed to this court, where they were affirmed in August 1996.[4] The trial court in the instant case did not enter its final judgment entry of conviction and sentence appellant until August 20, 1997, almost one full year after the *Keaton* appeals had been resolved. Thus, unlike the accused in *Gibson*, where the accused's prior conviction for a criminal offense was found to be defective on appeal, appellant's prior convictions were upheld on appeal. In a case such as this, where an appellate court affirms a prior conviction used to elevate a subsequent offense, an appellant suffers no prejudice.

Because we find (1) that appellant's indictment complied with the requirements of Crim.R. 7(B), and (2) that the inclusion of appellant's prior convictions which were on appeal worked no prejudice to appellant, appellant's fifth assignment of error is overruled. The judgment of the Fayette County Court of Common Pleas is affirmed.

*Judgment affirmed.*

KOEHLER and WALSH, JJ., concur.

---

**4.** See convictions in *State v. Keaton* (Aug. 31, 1995), Fayette C.P. Nos. 930131CR and 930132CR, which were subsequently upheld by this court in *State v. Keaton* (1996), 113 Ohio App.3d 696, 681 N.E.2d 1375.